**CALIFORNIA COSMETOLOGY
COALITION, et al.,
Plaintiffs,**

v.

**Richard W. RILEY, Secretary
of Education, Defendant.**

**Civ. A. No. 94–6406 RG(GHKx).**

United States District Court,
C.D. California.

Nov. 22, 1994.

Leslie H. Wiesenfelder and Thomas Dorer, of Dow, Lohnes & Albertson, Washington, DC, Justin J. Shrenger and Edwin D. Hausmann of Murphy, Shrenger & Weiss, Los Angeles, CA, for plaintiffs.

Nora M. Manella, U.S. Atty., Leon W. Weidman, Asst. U.S. Atty., Chief, Civ. Div., Russell W. Chittenden, Asst. U.S. Atty., and Mary L. Perry, Asst. U.S. Atty., Los Angeles, CA, Steven Z. Finley and James O'Neill, Office of the Gen. Counsel, U.S. Dep't of Educ., Washington, DC, for defendant.

## ORDER RE PRELIMINARY INJUNCTION

GADBOIS, District Judge.

Plaintiffs' Motion for a Preliminary Injunction came on for hearing before this Court, the Honorable Richard A. Gadbois, Jr., presiding, on Monday, October 24, 1994, at 10:00 a.m. Having considered the moving and opposition papers and arguments of counsel, the Court hereby rules as follows:

Plaintiffs' Motion for a Preliminary Injunction is hereby *GRANTED*.

### I. Background

This suit arises from regulations promulgated by the Secretary of Education pursuant to the Higher Education Act ("HEA"), 20 U.S.C. § 1070 *et seq.* The Secretary of Education ("Secretary") and the Department of Education ("DOE") promulgated regulations dealing with the refunds due to students who withdraw from, take a leave of absence, or otherwise cease attending postsecondary educational institutions participating in one or more federally authorized student financial aid programs under Title IV of the HEA, as amended, 20 U.S.C. §§ 1070–1099c–1. Title IV programs offer both loan and grant assistance to students who demonstrate the requisite financial need.

Plaintiffs California Cosmetology Coalition ("CCC") and American Association of Cosmetology Schools ("AACS") contend that the regulations promulgated by the Secretary violate the enabling statute by requiring participating institutions to refund more monies than the 1992 Amendments to the HEA deemed "fair and equitable." The statutory and regulatory framework of the instant action is somewhat complex and calls for some preliminary background on the HEA and the accompanying regulations.

On July 23, 1992, Congress enacted the Higher Education Amendments of 1992 ("the 1992 Amendments"), creating a statutory requirement that all postsecondary institutions participating in Title IV Programs must develop a "fair and equitable" policy for refunding institutional charges and unearned tuition to students who do not complete the period of enrollment for which Title IV assistance was provided. Pub.L. 102–325, § 485(a), 1992 U.S.C.C.A.N. 619 (July 23, 1992), codified at 20 U.S.C. § 1091b(a).

Congress prescribed specific minimum standards under the HEA for institutions to calculate and make refunds:

**(b) Determinations**

The institution's refund policy *shall be considered* to be fair and equitable for the purposes of this section if that policy provides for a refund in an amount of at least the largest of the amounts provided under—

(1) the requirements of applicable state law;

(2) the specific refund requirements established by the institution's nationally recognized accrediting agency and approved by the Secretary; or

(3) the *pro rata* refund calculation described in subsection (c) of this section ...

20 U.S.C. § 1091b(b) *(emphasis added)*.

The *pro rata* refund calculation of § 1091b(c), in turn, applies only to first-time students who drop out on or before 60% of the enrollment period has expired. Plaintiffs do not challenge the Secretary's implementation of the *pro rata* refund provision, and it is not directly relevant to the analysis that follows.[1]

In the 1992 Amendments, Congress also included provisions criminalizing the failure to refund funds, assets or property provided or insured under the Title IV programs.

---

1. A subsection (c) refund is calculated to be "not less than that portion of the tuition, fees, room and board, and other charges assessed the student ... *less any unpaid charges owed by the student for the period of enrollment ...*"

The pro rata refund provision of subsection (c) is only relevant to the following analysis insofar as the Secretary attempts to base his interpretation of subsection (b) at least in part on his construction of subsection (c).

Pub.L. No. 102–325, § 495, codified at 20 U.S.C. § 1097(a).

Prior to the passage of the 1992 Amendments, the Secretary had published a notice of proposed rulemaking ("NPRM"), proposing to amend 34 C.F.R. § 668.22, the institutional refunds and repayments provision, to require institutions calculating student refunds to subtract "any unpaid amount of a scheduled cash payment" from the amount of institutional charges the institution is permitted to *retain.* 56 Fed.Reg. 66,502 (promulgating 34 C.F.R. § 668.22(a)(3)). These proposed changes were enacted in substantially unchanged form by the Department of Education on June 8, 1993. 58 Fed.Reg. 32,188, amending 34 C.F.R. § 668.22(a).

On February 28, 1994, the Secretary published another NPRM, 59 Fed.Reg. 9526, proposing a substantial restructuring of the refund provisions of 34 C.F.R. § 668.22. On April 29, 1994, the Secretary published interim final regulations adopting the proposed regulations. Plaintiffs claim that these new provisions, though closely paralleling the statutory language of the HEA, depart from the calculations set forth in the HEA. Like the June 1993 regulations, the April 1994 regulations require institutions to exclude unpaid scheduled cash payments from the amount of earned institutional charges the school can retain, thereby increasing the required refund.

Under the Secretary's June 1993 and April 1994 regulations ("the Refund Regulations"), a school is required to calculate each of the three possible refunds, the state law refund, the accrediting agency refund, and the statutory *pro rata* refund, separately and determine which one is the largest. However, the Refund Regulations *also* require that the schools refund any unpaid amount of a scheduled cash payment owed the school by the student (calculated by subtracting the amount paid by the student for that payment period from the scheduled cash payment for the payment period). 34 C.F.R. § 668.22(a)(3), (4).[2] Moreover, if the unpaid amount of a student's scheduled cash payment is greater than or equal to the amount which may be retained by the school under its refund policy, the school must return the total amount to Title IV, HEA assistance to the government. 34 C.F.R. § 668.22(a)(5). It is this *additional amount* which the schools may not retain under the Refund Regulations, in excess of that expressly deemed "fair and equitable" by Congress, that Plaintiffs contend violates the 1992 Amendments.

Plaintiffs allege that the following regulations violate the plain meaning of the 1992 Amendments by distorting the state law and accrediting agency refund calculation procedures: 34 C.F.R. § 668.22(a)(2), (a)(3), (a)(4), (a)(5), (b)(1)(iv), (c)(2), (c)(3), (f)(2).[3] Plain-

---

2. See Appendix for sample refund calculations under the statute and the regulations.

3. 34 C.F.R. § 668.22(a):
(2) For purposes of this section, an institutional refund means the amount paid for institutional charges for a payment period minus the amount that the institution may retain under paragraph (a)(4) of this section for the portion of the payment period that the student was actually enrolled at the institution.
(3) An institution may not include any unpaid amount of a scheduled cash payment in determining the amount that the institution may retain for institutional charges . . .
(4) In determining the amount that the institution may retain for the portion of the payment period during which the student was actually enrolled, an institution shall—
(i) Compute the unpaid amount of a scheduled cash payment by subtracting the amount paid by the student for that payment period from the scheduled cash payment for the payment period; and

(ii) Subtract the unpaid amount of the scheduled cash payment from the amount that may be retained by the institution according to the institution's refund policy.
(5) An institution shall return the total amount of title IV, HEA program assistance (other than amounts received from the CWS program) paid for institutional charges for the payment period if the unpaid amount of the student's scheduled cash payment is greater than or equal to the amount which may be retained by the institution under the institution's refund policy.
§ 668.22(b)(1)(iv): For purposes of determining a refund when the pro rata refund calculation under ¶ (b)(1)(iii) of this section does not apply, and no standards for refund calculations exist under ¶¶ (b)(1)(i) and (ii) of this section, the larger of—
(A) The specific refund standards contained in Appendix A to this part; or (B) the institution's refund policy.
§ 668.22(c)
(2) A "scheduled cash payment" is the amount of institutional charges that is not paid for by finan-

tiffs now move for a preliminary injunction against the Secretary preventing the enforcement of the above regulations.

## II. Analysis

### A. Res Judicata

As a preliminary matter, this Court must consider the Secretary's contention that Plaintiffs in the instant motion for a preliminary injunction are bound by the doctrine of *res judicata* as to the ruling of the Honorable Thomas F. Hogan of the D.C. District Court against the Career College Association. *See Career College Ass'n, et al. v. Richard W. Riley,* Civ. Action No. 94–1372 (D.D.C. Aug. 9, 1994), 27–28, 1994 WL 454713. It appears that four members of Plaintiff AACS' five hundred and four members also belong to the Career College Association. Supplemental Declaration of Ronald E. Smith ¶ 3. No member of Plaintiff CCC is also a member of the Career College Association. Declaration of Robert Gross ¶ 16.

■ It is undisputed that the issue facing the D.C. District Court was substantially identical to that before this Court: namely, the validity of the Refund Regulations in light of the language of § 1091b(b). Judge Hogan granted summary judgment on this issue in favor of the Secretary. Judge Hogan's reasoning behind this ruling is somewhat terse:

> The Secretary has set forth a reasoned basis to support the challenged regulations. Because the Court finds that the regulations are reasonable and implemented in accordance with the 1992 HEA Amendments, the Court grants summary judgment as a matter of law in favor of defendants.

Civ. Action No. 94–1372 (D.D.C. August 9, 1994), 28.

Notwithstanding its brevity, this ruling is a final judgment on the merits for the purpose of *res judicata* and is a clear rejection of arguments substantially identical to those made by Plaintiffs in the instant case. See Plaintiff Career College Association's Reply Memorandum in Support of Plaintiff's Motion for Summary Judgment, pp. 17–19. This Court must thus determine whether the instant preliminary injunction extends to those four institutions, as yet unnamed, with membership in both the CCA and the AACS.

■ There must be an identity of the parties between the prior and subsequent suits before operation of the *res judicata* doctrine is triggered. *Allen v. McCurry,* 449 U.S. 90, 101 S.Ct. 411, 66 L.Ed.2d 308 (1980); *Blonder–Tongue Laboratories, Inc. v. University of Illinois Foundation,* 402 U.S. 313, 329, 91 S.Ct. 1434, 1443, 28 L.Ed.2d 788 (1971). Under federal law, mere membership in a trade association alone does not create the privity necessary to bind the member to a judgment against an organization. *Viceroy Gold Corp. v. Aubry,* 858 F.Supp. 1007, 1018 (N.D.Cal.1994). "A final judgment in federal court against a trade association will not be res judicata against a member unless the member authorized the litigation in some way [citations omitted]." *Id.*

It is unclear at this early stage in the proceedings whether the four AACS/CCA members implicitly authorized the previous matter before the D.C. Court by, for example, subsidizing the litigation. *See, e.g., General Foods Corp. v. Mass. Dep't of Public Health,* 648 F.2d 784, 788 (1st Cir.1981). It is also not apparent that the CCA was a "body vested with representative authority" as to its members, *see, e.g., Expert Electric, Inc. v. Levine,* 554 F.2d 1227, 1233 (2d Cir.), *cert. denied,* 434 U.S. 903, 98 S.Ct. 300, 54 L.Ed.2d 190 (1977), or that the four members participated in or controlled the previous liti-

cial aid for the period of enrollment for which the student has been charges exclusive of—

(i) Any amount scheduled to be paid by Title IV, HEA program assistance that the student has been awarded that is payable to the student even though the student has withdrawn ...

(ii) Late disbursements ...

(3) The "unpaid amount of a scheduled cash payment" is computed by subtracting the

amount paid by the student for the period of enrollment ... from the scheduled cash payment for the period of enrollment ...

§ 668.22(f)(2) For purposes of this section, except for the calculation of a pro rata refund required under ¶ (b)(1)(iii) of this section—

(ii): An institution may not include any unpaid amount of a scheduled cash payment in determining the amount that the institution may retain for institutional charges ...

gation, *see, e.g., Montana v. United States,* 440 U.S. 147, 154, 99 S.Ct. 970, 974, 59 L.Ed.2d 210 (1979); *accord Crane v. Commissioner,* 602 F.Supp. 280, 287 (D.Me.1985), *United States v. ITT Rayonier, Inc.,* 627 F.2d 996, 1003 (9th Cir.1980). In light of the absence of documentation concerning the identity of the four schools and their role in the previous litigation, this Court declines to apply the doctrine of *res judicata* as to the D.C. District Court's ruling at this time.[4]

### B. Plaintiff's Standing as to Students Who Withdraw or Drop Out

The Secretary also contends that Plaintiffs do not have standing in the instant case to the extent that they purport to represent the interests of their student membership because the students who are allegedly injured by the Refund Regulations are those who have *withdrawn* from enrollment in the member institutions. This argument appears meritless insofar as Plaintiffs have stated in declarations that students do not lose their membership by dropping out or otherwise leaving their programs. Declaration of Robert Gross, ¶ 4.

### C. The standard for injunctive relief

◼ The Ninth Circuit's traditional test for determining whether to issue a preliminary injunction requires the moving party to demonstrate the following:

1. The moving party will suffer irreparable injury if the injunctive relief is not granted;

2. The moving party has a substantial likelihood of succeeding on the merits;

3. An injunction will not harm the non-moving party more than it helps the moving party; and

4. Granting injunctive relief is in the public interest.

4. Plaintiffs also argue that the DOE cannot enforce the Refund Regulations against any party, including the dual CCA/AACS members. Under the terms of the DOE's own regulations, the refund policy provisions must be enforced uniformly across the nation:

All such regulations shall be applied and enforced uniformly throughout the fifty states. 20 U.S.C. § 1232(c).

*City of Tenakee Springs v. Block,* 778 F.2d 1402, 1407 (9th Cir.1985); *Martin v. Int'l Olympic Comm.,* 740 F.2d 670, 674–5 (9th Cir.1984).

◼ More recently, the Ninth Circuit has articulated an alternative test. Under this test, the moving party must demonstrate either:

1. The moving party is likely to prevail on the merits and will possibly suffer irreparable harm if a preliminary injunction is not granted; or

2. The lawsuit raises serious questions and the balance of hardships tips sharply in the movant's favor.

*Gilder v. PGA Tour, Inc.,* 936 F.2d 417, 422 (9th Cir.1991). This alternative standard represents a continuum of equitable discretion whereby the greater the probability of success on the merits, the less irreparable injury that must be shown, to the point that the court need not balance the relative hardships. *See Briggs v. Sullivan,* 886 F.2d 1132, 1143 (9th Cir.1989).

For the purposes of this motion, this Court evaluates whether Plaintiffs have shown probable success on the merits and the possibility of irreparable harm.

### D. Plaintiffs' Likelihood of Success on the Merits

1. The Proper Standard for Reviewing the Refund Regulations

◼ This Court must first address the appropriate standard of review to govern its examination of the regulations at issue. In the usual challenge to an agency's construction of the statute it administers, the standard of review is set forth in *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81

Under Plaintiffs' reasoning, a judgment by this Court in favor of Plaintiffs would appear to preclude the DOE from enforcing the Refund Regulations anywhere, even in a jurisdiction like Washington, D.C., where a court of competent jurisdiction has explicitly upheld their validity.

Defendant may file a supplemental briefing with this Court regarding both the effects of § 1232(c) and the role of the four dual CCA/AACS schools in the previous litigation.

L.Ed.2d 694 (1984). Under *Chevron*, the amount of deference which is accorded an agency's construction of the statute it administers involves a twofold inquiry. First, the Court must determine whether Congress has spoken directly to the precise question at issue. If Congress' intent is clear from the statute, neither the agency nor the court can contravene the express legislative intent. If, however, the statute is silent or ambiguous on the issue in dispute, the court must defer to the agency's reasonable interpretation of the statute. *Id.* at 842–43, 104 S.Ct. at 2781–82.

■ In the instant case, the statute and regulations have a penal component, providing for fines and/or incarceration for the willful or knowing failure to refund the amounts due. 20 U.S.C. § 1097(a).[5] Plaintiffs argue that in light of the penal provisions under the HEA, *Chevron* deference does not apply, and this Court must instead apply the so-called "rule of lenity" in reviewing the DOE regulations.[6] The rule of lenity mandates that ambiguity in criminal statutes be resolved in favor of lenity for the accused. *See Dowling v. United States,* 473 U.S. 207, 213–14, 105 S.Ct. 3127, 3131–32, 87 L.Ed.2d 152 (1985) ("[W]hen a choice has to be made between two readings of what conduct Congress has made a crime, it is appropriate, before we choose the harsher alternative, to require that Congress should have spoken in language that is clear and definite." [citations omitted])

■ The rule of lenity can apply in civil statutes which have criminal applications, as well as in purely penal statutes. *See United States v. Thompson/Center Arms,* 504 U.S. 505, ——, 112 S.Ct. 2102, 2109, 119 L.Ed.2d 308, 319 (1992) (holding that the rule of lenity applies to the interpretation of an ambiguous provision of the National Firearms Act, a civil statute with criminal provisions). This Court finds the *Thompson/Center Arms* case

instructive, though neither party refers to it in the papers. In *Thompson/Center Arms,* the Supreme Court grappled with the question whether a kit containing the unassembled component parts of a short-barreled rifle was a "firearm" under the National Firearms Act ("NFA"), 26 U.S.C. § 5845(a)(3). The NFA is a civil statute that regulates firearm manufacturing and ownership. Like the 1992 Amendments in the instant case, the NFA also provides for criminal penalties for those who fail to pay the required taxes, make any firearms without permission, or possess unregistered firearms. 26 U.S.C. §§ 5861, 5871. The Supreme Court found the statute ambiguous on its face as to whether a kit was a "firearm" and invoked the rule of lenity in its construction of the statute.

■ The determinative issue for the Court was the absence of a willfulness requirement in the NFA penal provision:

> The key to resolving the ambiguity lies in recognizing that although it is a tax statute that we construe now in a civil setting, the NFA has criminal applications that carry no additional requirement of willfulness.

*Id.* at ——, 112 S.Ct. at 2109, 119 L.Ed.2d at 319.

Unlike the penal provisions of the NFA, however, the penal provision in the HEA is limited to knowing or willful conduct. 20 U.S.C. § 1097(a). In light of the reasoning in *Thompson/Center Arms,* the rule of lenity does not apply to the instant case.

At least one other court construing a statute with criminal applications for willful noncompliance has applied *Chevron* rather than the rule of lenity. *See, National Rifle Ass'n v. Brady,* 914 F.2d 475, 480 n. 3 (4th Cir. 1990), *cert. denied,* 499 U.S. 959, 111 S.Ct. 1580, 113 L.Ed.2d 645 (1991) (applying *Chevron* to the Gun Control Act, 18 U.S.C. § 923(d)(1)(E)(i)). Accordingly, this Court

---

**5.** § 1097(a) Any person who knowingly and willfully embezzles, misapplies, steals, obtains by fraud, false statement or forgery, or fails to refund any funds, assets, or property provided or insured under this subchapter ... shall be fined not more than $20,000 or imprisoned for not more than 5 years, or both ...

**6.** This is clearly a secondary argument made by Plaintiffs in case this Court finds that the statute is ambiguous on its face. *See* Plaintiffs' Reply, p. 3. However, this Court wishes to articulate the proper standard of review at the outset of its analysis.

will review the Refund Regulations under the deferential *Chevron* standard.

## 2. Plaintiffs Have a Strong Likelihood of Prevailing on the Merits

■■■ In the instant case, Plaintiffs urge that the 1992 Amendments are clear and unambiguous on their face. They have a strong likelihood of prevailing on this contention. Congress specifically stated that a refund *"shall be considered fair and equitable for the purposes of this section"* if that policy provides for a refund in an amount of at least the largest of (1) the state law measure; (2) the accrediting agency's measure; or (3) the statutory *pro rata* measure. § 1091b(b). Nowhere in § 1091b does Congress state that the actual calculation of the refund under state law or accrediting agency policy must, or even may, include unpaid scheduled cash payments to constitute a "fair and equitable" refund under the statute.[7]

A simple hypothetical illustrates the problem with the DOE's interpretation of the statute. If Congress had written § 1091b(b) to require that the participating institutions refund the largest of three possible amounts, (1) the accrediting agency amount; (2) a constant sum, for instance, $500; and (3) the statutory *pro rata* amount, it would be ludicrous to contend that what Congress really meant was $500 *plus the unpaid scheduled cash payments*. This Court finds that the incorporation of the amount required under state law is no less a constant vis-a-vis the DOE than is a sum certain, such as $500. By promulgating regulations which increase the minimum "fair and equitable" refund under the 1992 Amendments by the unpaid amount of scheduled cash payments, the Secretary has effectively rewritten what is "fair and equitable" under § 1091b(b) and violated the clear and unambiguous statutory language.

■■■ A regulation may not serve to amend a statute, *Koshland v. Helvering*, 298

U.S. 441, 447, 56 S.Ct. 767, 770, 80 L.Ed. 1268 (1936), or to add to the statute "something which is not there." *United States v. Calamaro*, 354 U.S. 351, 359, 77 S.Ct. 1138, 1143, 1 L.Ed.2d 1394 (1957). *Accord, World Serv. Life Ins. Co. v. United States*, 471 F.2d 247, 250 (8th Cir.1973) ("[I]f the regulation adds to or subtracts from the intended Congressional interpretation, then it must be invalid.") It appears to this Court that Plaintiffs have a strong argument that the DOE has added to the HEA "something which is not there," thereby exceeding its administrative authority.

The Secretary tries to avoid this result by invoking several statutory construction arguments. In effect, the Secretary attempts to manufacture statutory ambiguity and silence where none exists. First, the Secretary argues that the DOE has the authority to construe the word "unearned" in § 1091b(a) in such a way as to include unpaid institutional charges in the required refunds under § 1091b(b). The Secretary attempts to shift the focus of the instant debate from the actual calculations required under § 1091b(b) to the ambiguous meaning of "unearned" in § 1091b(a). The Secretary correctly notes that under *Chevron* a court must defer to an agency's reasonable construction of ambiguous statutory language. However, in the instant case, the term "unearned" appears nowhere in the calculation provision of § 1091b(b). Its single appearance in § 1091b(a) is clearly introductory and non-substantive in nature:

> "Each institution of higher education participating in a program under this subchapter ... shall have in effect a fair and equitable refund policy under which the institution refunds *unearned* tuition, fees, room and board, and other charges ..."

*Id.*

The Secretary cannot simply import a term he claims is ambiguous from one provision of the statute to another. The term "unearned" is nowhere incorporated into the calculation

---

[7]. This Court notes that neither party cites to the legislative history of the 1992 Amendments to support its construction of § 1091b. In light of the clear and unambiguous language used by Congress, an analysis of the legislative history of § 1091b is unnecessary. *Farr v. United States*,

990 F.2d 451, 455 (9th Cir.) ("We must follow the plain meaning of [the statute] and need not look to legislative history where [its] meaning is clear on [its] face."); *cert. denied*, — U.S. —, 114 S.Ct. 634, 126 L.Ed.2d 592 (1993).

provision of § 1091b(b); nor does the general introductory language of § 1091b(a) override the more specific calculation requirements of § 1091b(b).

Although Congress used the term "unearned" in its introductory provision, the precise contours of what "unearned" means are not relevant to calculating what Congress has mandated as a "fair and equitable" refund. Accordingly, the Secretary's policy arguments concerning what "unearned" should mean in the Title IV refund context are interesting but irrelevant.[8]

A second statutory construction argument that the Secretary invokes to justify the Refund Regulations involves the statutory *pro rata* provision in § 1091b(c). Under subsection (c), Congress delineated a required refund calculation for first-time students who cease attending school on or before the 60% point in the enrollment period. In this subsection, Congress specifically provided that unpaid charges owed by the student for the enrollment period are not to be included in the *pro rata* refund calculation.[9] The Secretary and the Plaintiffs take diametrically opposed positions on the significance of the exclusion of unpaid charges from the *pro rata* refund under subsection (c).

The Secretary contends that the subtraction of unpaid charges under subsection (c) was "a special step that Congress added to benefit institutions in *this particular circumstance* [*i.e.,* for first-time students who leave or drop out on or before the 60% point in the enrollment period], but did not intend as a general benefit to institutions in *all* refund situations." The Secretary reasons that since unpaid charges were mentioned in subsection (c) but not in subsection (b), this

Court cannot imply the term "unpaid charges" where it has been excluded. *Sundance Land v. Community First Fed. Savings & Loan,* 840 F.2d 653, 663 (9th Cir.1988) ("Where Congress has carefully employed a term in one place and excluded it in another, it should not be implied where excluded.")

The Secretary recites the correct legal principle under *Sundance* but applies it to the wrong term. The Secretary's argument appears to be that subsection (c) provides that schools can *retain* unpaid charges; since subsection (b) is silent on the matter, it must mean that schools governed by subsection (b) cannot *retain* these charges but must rather refund them. Plaintiffs, in turn, also invoke the principle of *expressio unius est exclusio alterius* under *Sundance* but reach precisely the opposite outcome. Plaintiffs argue that the absence of the term "unpaid charges" in subsection (b) does not mean that schools must necessarily refund or retain such charges. This purported "silence" on the issue simply means that Congress had no particular intention as to the inclusion or exclusion of unpaid charges in subsection (b) refunds. Instead, Congress explicitly stated that existing state law or accrediting agency policy govern the calculations and incorporated these independent refund calculations into its statutory framework.

Plaintiffs' argument is the more compelling of the two. Under *Sundance,* neither this Court nor the DOE may imply "unpaid charges," whether they are being refunded or retained, where they do not exist in the language of the statute. Indeed, the fact that Congress simultaneously developed its own *pro rata* calculation for first-time students and determined that schools may retain unpaid charges under specific circum-

---

8. The Secretary interprets "unearned" to mean the *unearned portion* of total institutional charges, whether actually received or not. Under this construction, a school has to return the total amount it would have received if the student had completed the enrollment period, including unpaid charges. According to the Secretary, "the only consequence of [this] approach is that the institution must look to the student rather than Title IV funds for a larger portion of its compensation." Defendant argues that this approach makes the size of the refund a function of the amount the student has paid, thereby creating an unpredictable system.

9. As used in this section, the term "pro rata refund" means a refund by the institution to the student ... of not less than that portion of the period of enrollment for which the student has been charged ..., less any unpaid charges owed by the student for the period of enrollment for which the student has been charged, and less a reasonable administrative fee not to exceed the lesser of 5% of the tuition, fees, room and board ..." § 1091b(c)(1).

stances in no way implies that Congress made a contrary determination as to all other situations. Nor does the statutory *pro rata* calculation under subsection (c), in conjunction with the explicit language of subsection (b), indicate that Congress left the DOE discretion to mandate the inclusion of unpaid charges in the refund calculations under state law or accrediting agency law.

A final argument which the Secretary fails to make in the instant case but which this Court should address for the sake of completeness is the effect of the term "at least" in § 1091b(b).[10] The only reasonable reading of this term, in conjunction with the mandatory language of the provision "shall be considered," is that Congress meant thereby to leave open the possibility for *greater* refunds if the *individual institution* so chose. This reading is supported by the literal language of the statute: *"The institution's* refund policy shall be considered to be fair and equitable ..." § 1091b(b) (emphasis added). Congress' underlying mandate remains clear: The greatest of the three measures in § 1091b(b) is still necessarily sufficient under the statute.

In light of the clear statutory language, this Court finds that Plaintiffs have demonstrated a substantial likelihood of succeeding on the merits.[11]

### E. Irreparable Injury

In order to make the requisite showing for a preliminary injunction, Plaintiffs must demonstrate either irreparable harm. The proper focus for assessing harm must be on the harm that will occur if the preliminary injunction does not issue, between the request for the preliminary injunction and the ultimate decision on the merits. The greater the likelihood of Plaintiffs' success on the

merits, the less irreparable injury must be shown. *See Briggs, supra,* at 1143.

Plaintiffs allege that the increased refunds mandated under the Refund Regulations have caused and continue to cause economic distress to students and schools alike. Plaintiffs demonstrate this hardship by citing at least one member school that has been found in non-compliance with the Refund Regulations and been forced to repay the unpaid charges of students who ceased attending its program. See Declaration of Leslie D. Zitzka, of the Capri School of Beauty Culture of Chicago ("Zitzka Declaration"). The Capri School of Beauty will have to refund approximately $10,000 in unpaid charges to the government (equalling a $250 charge per student) and will have to obtain the money owed them directly from the students who dropped out. Zitzka Declaration ¶ 9.

The sample calculations have demonstrated that the harm sustained by students who must for various reasons take a leave of absence or drop out of their programs can be substantial under the Refund Regulations. The extent of this harm can only be determined if this Court knows how many students have ceased attending their programs since implementation of the Refund Regulations. Although this statistic does not appear to be in evidence, and may not yet be available, Plaintiffs have submitted statistical evidence of how many students across the country fail to finish their respective cosmetology programs. See Suppl.Decl. of Ronald E. Smith. The numbers appear to be substantial (approximately 31.16% of students nationally fail to complete their studies), and are likely even greater since at least some students might cease attending temporarily for financial, childcare, or health reasons, and then return.

---

**10.** "The institution's refund policy shall be considered to be fair and equitable for purposes of this section if that policy provides for a refund in an amount of *at least the largest of the amounts provided under [the three different measures]."*

**11.** Plaintiffs present several other arguments as to the invalidity of the Refund Regulations. First, Plaintiffs contend that the Refund Regulations are unlawful because they abrogate their commonlaw right of offset. In effect, the Plaintiffs claim that the increased refunds required

under the Refund Regulations prevent them from applying that portion of funds they have received from or on behalf of the students to the debt that the student has incurred to the school while enrolled there. Second, Plaintiffs contend that the Refund Regulations divest students of their statutory entitlements to Title IV monies.

In light of its conclusions concerning the statutory language, *supra,* this Court declines to reach the merits of these additional arguments.

The possibility of irreparable injury is compounded by the criminal application of the 1992 Amendments. 20 U.S.C. § 1097(a). At least one owner of a vocational trade school has been prosecuted under § 1097, albeit before the 1992 Amendments came into effect. See *United States v. Niebergall*, 885 F.2d 867 (4th Cir.1989). The possibility certainly exists that other school owners may be prosecuted for failure to refund federal Title IV monies.

The Secretary correctly points out that Plaintiffs must demonstrate "immediate threatened injury," *Caribbean Marine Serv. Co. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988), and support the threat of this injury by factual allegations demonstrating that their fear is more than merely speculative. *Goldie's Bookstore, Inc. v. Superior Court of State of Calif.*, 739 F.2d 466, 472 (9th Cir. 1984). In the instant case, Plaintiffs have demonstrated the likelihood of irreparable harm resulting from the enforcement of the regulations as promulgated. The difficulty in paying the increased refunds may drive some small schools out of business and may well saddle students with unexpected additional debt.

The Secretary contends that the balance of hardships tips in his favor, since the Refund Regulations were part of a cohesive regulatory scheme designed to create incentives for schools to select students with the potential to succeed in their chosen programs. In light of this Court's finding that Plaintiffs have a significant likelihood of prevailing on the merits, this Court declines to engage in a balancing of the hardships analysis. *See Bernard v. Air Line Pilots Ass'n*, 873 F.2d 213, 217 (9th Cir.1989) ("Where a party can show a strong chance of success on the merits, he need show only a possibility of irreparable harm. Where, on the other hand, a party can show only that serious questions are raised, he must show that the balance of hardships tips sharply in his favor" (citation omitted)).

However, this Court notes in passing that it seems highly unlikely that a preliminary injunction would disrupt the entire Title IV program. In contrast, the Refund Regulations as promulgated require Plaintiffs to make significant changes in how they conduct their business; if they fail to do so, Plaintiffs may face severe sanctions. These factors suggest that a preliminary injunction is appropriate. *See, e.g., Abbott Laboratories v. Gardner*, 387 U.S. 136, 153–54, 87 S.Ct. 1507, 1517–18, 18 L.Ed.2d 681 (1967) ("The alternative to compliance ... may be even more costly. That course would risk serious criminal and civil penalties for the unlawful distribution of "misbranded" drugs").

Thus, Plaintiffs have sufficiently demonstrated that the likelihood of irreparable harm in the absence of a preliminary injunction.

### III. Conclusion

In sum, this Court finds that Plaintiffs have shown that they have a substantial likelihood for success on the merits and that they will suffer irreparable injury if this Court fails to issue a preliminary injunction against enforcement of the Refund Regulations. Accordingly, this Court hereby GRANTS Plaintiffs' motion for a preliminary injunction.

**IT IS SO ORDERED.**

### *APPENDIX*

#### Sample Calculations

The Secretary has made it explicit to schools that when calculating the three possible refunds under the 1992 Amendments, § 1091b(b), the school "must subtract any unpaid charges from the amount retained by the school." Dear Colleague Letter of March 1994, p. 1, GEN–94–13 ("Dear Colleague Letter"). The following examples may clarify the effect of the Refund Regulations on the three possible repayment calculations.

Bob is a first-time student receiving Title IV funds at College, located in state X. Bob drops out after three weeks, or 30% into the enrollment period. College must calculate Bob's refund using all three methods outlined in the 1992 Amendments (the statutory *pro rata* calculation applies here because Bob is a first-time student dropping out on or before the 60% point in the enrollment period).

The total charges at College for the enrollment period are $1500. Bob received a Pell Grant under Title IV for $850 that was credited directly toward school charges. Bob also made a $500 cash payment to College. Bob's unpaid charges are thus $150.

The applicable refund policy in State X allows a school to retain charges proportional to the portion of the enrollment period completed by Bob, in this case 30%. The accrediting agency policy for College allows College to retain 45% of the charges for any student who withdraws after two weeks but before four weeks. The statutory *pro rata* calculation under the 1992 Amendments allow College to retain charges proportional to the portion of the enrollment period completed, here 30%.

Since the calculations mandated by the 1992 Amendments and the *Refund Regulations* diverge, I will outline both separately.

a. *The Statutory Calculations* (based on the plain language of the statute):

1. **State Law Calculation.** Under State X's refund policy, College can retain 30% of its institutional charges, or .30 × $1500 = $450. College must refund the difference between what it has received ($1350) and what it may retain ($450), or $900.

   **College retains:** $450.

   **College repays:** $900.

2. **Accrediting Agency Policy Calculation.** College can retain 45% of its institutional charges, or .45 × $1500 = $675. College must refund the difference between the institutional payments received ($1350) and the payments it may retain ($675), or $675.

   **College retains:** $675.

   **College repays:** $675.

3. **Statutory *pro rata* Calculation.** College can retain 30% of its paid and unpaid institutional charges, or .30 × $1500 = $450. However, College can deduct Bob's unpaid charges ($150) from the initial refund amount ($1050).

School must thus refund $1050—$150, or $900.

**College retains:** $450.

**College repays:** $900.

b. *The Refund Regulations Calculations:*

1. **State Law Calculation.** Under the Refund Regulations, College must subtract the amount of the unpaid institutional charges, or $150, from the amount it is entitled to retain under state law, or $450. Under the Refund Regulations, College can retain $300. It must refund the difference between the amount retained ($300) and the amount actually paid to institutional costs ($1350), or $1050.

   **College retains:** $300.

   **College repays:** $1050.

2. **Accrediting Agency Policy Calculation.** Under the Refund Regulations, College must subtract the amount of unpaid institutional charges, or $150, from the amount it is entitled to retain under accrediting agency policy, or $675. Under the Refund Regulations, College can retain only $500. It must then refund the difference between the amount retained ($500) and the amount actually paid to institutional costs ($1350), or $850.

   **College retains:** $500.

   **College repays:** $850.

3. **Statutory *pro rata* Calculation.** The statutory *pro rata* calculation is unaffected by the Refund Regulations. College can thus retain $450 and must refund only $900.

   **College retains:** $450.

   **College repays:** $900.

c. *Conclusion*

Under the statutory framework of the 1992 Amendments, College would be required to repay $900 and retain $450 (the result is the same under both the state law and the statutory *pro rata* calculations). However, under the regulatory framework, the state law calculation provides the largest refund because the unpaid charges are deducted therefrom. Thus, College would

have to repay $1050 and would be entitled to retain only $300.[12] By promulgating regulations which require that unpaid charges be deducted from what College can retain under the 1992 Amendments, the Secretary has effectively increased the required refund College must pay by $150.

Indeed, under the Refund Regulations, the state law refund, to the extent that it provides that the amount retained by the same proportion as the amount of the enrollment term completed, will *always* provide a larger refund than the statutory *pro rata* measure if there are unpaid charges. This result renders nonsensical the statutory *pro rata* provision which allows schools to deduct unpaid charges from the amount they must refund.

---

**12.** Under federal statute, $800 of this refund would be returned to the Pell Grant program and $200 to Bob. Dear Colleague Letter at 3.