**CAREER COLLEGE ASSOCIATION, et al., Appellants,**

v.

**Richard W. RILEY, Secretary of the United States Department of Education, Appellee.**

No. 94–5270.

United States Court of Appeals, District of Columbia Circuit.

Argued Nov. 13, 1995.

Decided Jan. 26, 1996.

Thomas Hylden, Washington, DC, argued the cause and filed the briefs, for appellants.

Fred E. Haynes, Assistant United States Attorney and Steven Z. Finley, Attorney, Department of Education, pro hac vice, Washington, DC, argued the cause for appellee, with whom Eric H. Holder, Jr., United States Attorney, and R. Craig Lawrence, Assistant United States Attorney, were on the brief. John D. Bates and Thomas S. Rees, Assistant United States Attorneys, entered appearances.

Before: SILBERMAN, GINSBURG, and HENDERSON, Circuit Judges.

SILBERMAN, Circuit Judge:

The Higher Education Act, Title IV, governs federally funded student financial aid programs for college and post-secondary vocational training. 20 U.S.C. §§ 1070–1099 (1990 & 1992 Supp.). Congress amended the HEA in 1992 to improve the accountability and integrity of institutions participating in Title IV programs. The Department of Education (DOE) conducted regional meetings and "negotiated rulemaking sessions" to develop regulations to implement these amendments. Appellants raise five separate challenges to the regulations ultimately promulgated by the DOE. We reject these and affirm the district court's grant of summary judgment for Secretary Riley. We address each issue and the relevant facts in turn.

### Master Calendar Issue

Appellants contend that the entire set of regulations amending 34 C.F.R. Part 668, the Student Assistance General Provisions, is ineffective for the award year 1994–95 because it was not promulgated "in final form" by May 1, 1994, as required by the Master Calendar Provision. The Master Calendar Provision states that

> Any regulatory changes initiated by the Secretary ... that have not been published in final form by December 1 prior to the start of the award year shall not become effective until the beginning of the second award year after such December 1 date. For award year 1994–95, this subsection shall not require a delay in the effectiveness of regulatory changes ... that are published in final form by May 1, 1994.

20 U.S.C. § 1089(c) (1992). On February 17 and 28, 1994, the DOE published proposed rules for Part 668 and provided a 30–day comment period. 59 Fed.Reg. 8,044 (1994); 59 Fed.Reg. 9,526 (1994). On April 29, 1994, the DOE published an "Interim Final Rule," denominated "interim final regulations with invitation for comment." 59 Fed. Reg. 22,348 (1994). The April 29 Rule stated that its effective date was July 1, 1994,

with the exception of provisions containing information collection requirements for which Office of Management and Budget (OMB) approval was required under the Paperwork Reduction Act (PRA). Upon receiving OMB approval, the DOE would publish a notice announcing the effective date for these provisions. The Rule solicited comments by June 20, 1994, and stated that the Secretary would consider any comments received "in determining whether to make any changes in these rules," and would publish any changes or a notice indicating no changes would be made. No mention was made of when any such changes would become effective. On June 22, after the comment period but prior to the Rule's effective date, appellants filed suit, seeking declaratory and injunctive relief. Subsequently, on July 7, the DOE issued a notice that announced OMB approval for the information collection requirements, explained that the April 29 Rule was final and effective for the 1994–95 award year, reopened and extended the comment period until July 28, and announced that the comments had been solicited in anticipation of possible revisions for the 1995–96 award year. 59 Fed.Reg. 34,964 (1994).

Since the Secretary published the "Interim Final Rule" on April 29, 1994, the dispute turns on whether those regulations were then "in final form." Appellants assert that the use of "interim" necessarily implies that the regulations were subject to change and therefore not in final form. Congress did not explicitly authorize "interim final regulations" in the HEA, as it has elsewhere, and the other DOE regulations published the same day were not described as "interim," showing that the Secretary himself did not view Part 668 as a final rule. The Secretary also requested comments on the Rule by June 20 and stated that notice of any changes—or the lack thereof—would be published. This deadline, prior to the Rule's July 1 effective date, indicates that the Secretary was considering changes for 1994–95. That changes were contemplated, it is argued, undermines the function of the Master

Calendar Provision as a notice statute intended to apprise regulated institutions of the coming year's requirements. Comments responding to the Interim Final Rule show that such institutions viewed the April 29 notice as a proposed rather than a final rule. And the Secretary effectively recognized the ambiguity of the Rule by his publication of the July 7 correction notice. Finally, appellants argue that the regulation necessarily was subject to change since it had not yet received PRA approval from the OMB; several sections would not become effective until such approval was received, and failure to receive approval could result in changes.

■ The designation of the Rule as "interim," absent the explanation (given subsequently) that the Secretary contemplated that any revisions would take effect after the 1994–95 year and that comments were sought only for that purpose, was certainly maladroit. We agree with the government, however, that the rule passes muster under the Master Calendar Provision. The key word in the title "Interim Final Rule," unless the title is to be read as an oxymoron, is not interim, but *final.* "Interim" refers only to the Rule's intended duration—not its tentative nature. The designation of the July 1 effective date could only have meant—and, therefore, put the public on notice of that meaning—that the regulation was in final form when published and therefore complied with the Master Calendar Provision. The Secretary's request for comments on the Rule is explicable, as the government points out, in light of the short December 1 deadline for any proposed rules to be put in effect for the 1995–96 award year. That other final rules issued at the same time were not termed "interim" only suggests that the Secretary did not contemplate a possible modification of those rules in the following year. Nor do we think it particularly relevant that a number of commenters were confused. Competent counsel would surely have advised any client that the Secretary intended the Rule to be final as to the 1994–95 award year.[1] Any other construction would suggest

---

1. Counsel may well also have concluded that the Secretary's awkward description of the Rule and other factors would give rise to a reasonable

question whether the Rule was in conformity with the Master Calendar Provision—but that is

that the April 29 publication was without legal significance at all (a senseless repetition of the notice of proposed rulemaking).

There remains the matter of OMB approval. The government points out that OMB's own rules specify that its action under the PRA cannot rescind or amend a rule. Therefore, the published rule's finality is not affected by the fact that the Secretary had not received OMB approval at the time of promulgation—approval came only seven days before July 1 and was not published until the July 7 notice. Admittedly, it seems a bit anomalous for a rule that is on its face subject to another entity's approval to be considered final. But as a matter of law, the regulation would have been valid on July 1 whether or not OMB had approved the relevant portions. Absent OMB approval, the Department would not have been entitled to impose a sanction or withhold a benefit to a member of the regulated class, but the regulation still would have constituted a normative standard.[2] Accordingly, it cannot be said that the April 29 publication was not "final" within the meaning of the Master Calendar Provision.

### The Refund Regulation

Two provisions in the 1992 HEA amendments deal with refunds by institutions of "unearned tuition" upon the withdrawal of students during an enrollment period. Generally under the Title IV programs, both the federal government and the student will contribute to the cost of the student's education. The federal government pays its portion for each enrollment period up front; students, in contrast, may pay at varying rates throughout the enrollment period, according to the institution's payment policy. For example, if the entire institutional charges for the enrollment period were $5,000, the government might pay $4,000 initially and the student the remaining $1,000 spread over the course of the enrollment period. When a student with-

draws partway through the enrollment period, the institution must refund a certain portion of the charges to account for its reduced educational obligations toward the student. Appellants challenge regulations issued by the Secretary to govern the determination of this refund, claiming they conflict with the statutory refund provisions.

20 U.S.C. § 1091b (1992) requires that institutions develop a "fair and equitable" policy for refunding "unearned tuition." § 1091b(a). An institution's policy "shall be considered to be fair and equitable"

> if that policy provides for a refund in an amount of at least the largest of the amounts provided under—
>
> (1) the requirements of applicable State law;
>
> (2) the specific refund requirements established by the institution's nationally recognized accrediting agency and approved by the Secretary; or
>
> (3) the pro rata refund calculation described in subsection (c) of this section, except that this paragraph will not apply to the institution's refund policy for any student whose date of withdrawal from the institution is after the 60 percent point (in time) in the period of enrollment for which the student has been charged.

20 U.S.C. § 1091b(b). The second relevant statutory provision states that "refunds shall be credited in the following order:" first to reimburse federal government programs, then other sources of aid (e.g., state government programs), and last the student. 20 U.S.C. § 1092(a)(1)(F) (1992).

Under the prior refund regulations, institutions were not required to consider the student's scheduled, but not yet paid, cash payments in making § 1091b(b)'s refund calculation. Institutions therefore based refunds on the charges they had actually collected, not on the total charges for the enrollment period. The Secretary determined that this practice in effect paid the stu-

---

not the same thing as true confusion as to the purport of the Secretary's promulgation.

**2.** OMB's possible failure to approve a particular provision is also less troubling than appellants suggest because it could only serve to *reduce* an institution's potential exposure to limited partic-

ipation or other sanction. The published regulation therefore gives a maximum regulatory exposure; an institution knows fully the substantive requirements, but is aware that some may not be enforced if OMB approval is not forthcoming.

dent's unpaid charges from Title IV funds and had the collateral consequence of treating students inequitably because, as will be seen below, students who had paid their portion of the tuition before dropping out ended up paying more of the cost than students who had deferred or defaulted upon payment of their share. *See* 56 Fed.Reg. 66,498 (1991). Thus, after Congress enacted § 1092(a)(1)(F)'s refund crediting order in 1992, the Secretary issued a new "Refund Regulation" that required consideration of scheduled cash payments:

> (iii) In determining the amount that the institution may retain for the portion of the period of enrollment for which the student has been charged during which the student was actually enrolled, an institution shall—
>
> (A) Compute the unpaid amount of a scheduled cash payment by subtracting the amount paid by the student for that period of enrollment for which the student has been charged from the scheduled cash payment for the period of enrollment for which the student has been charged; and

> (B) Subtract the unpaid amount of the scheduled cash payment from the amount that may be retained by the institution according to the institution's refund policy . . .

34 C.F.R. 668.22(f)(2)(iii) (1994). Put simply, this requires that after calculating the refund under § 1091b(b)(1) and (2), the school subtract the student's unpaid charges from the amount it would otherwise retain.[3]

The effect of this provision on the refund calculation can best be seen in a numerical example. Assume the numbers from above—$5,000 total charges, $4,000 paid up front by Title IV programs, and $1,000 paid over the course of the semester by the student. If a student withdraws from a ten-week program after two weeks, the institution would be entitled, assuming a *pro rata* calculation for simplicity, to retain ⅕ of the tuition earned, here $1,000.[4] The following chart shows examples of the refund calculation under the prior and current regulations, assuming varying payments by the student:

| Amount Paid by Title IV Programs | Amount Paid / Unpaid By Student | Total Amount Paid | Prior Regulation: Amount Institution Retains | Amount Refunded (to Title IV) | Current Regulation: Amount Institution Retains | Amount Refunded (to Title IV) |
|---|---|---|---|---|---|---|
| $4,000 | $0 / $1,000 | $4,000 | $1,000 | $3,000 | $0 | $4,000 |
| $4,000 | $200 / $800 | $4,200 | $1,000 | $3,200 | $200 | $4,000 |
| $4,000 | $1,000 / $0 | $5,000 | $1,000 | $4,000 | $1,000 | $4,000 |

Assuming five equally spaced payments (the second row of the table), the student would only have paid $200 of his full $1,000 obligation. Under the prior regulations, the school would refund $3,200—the amount it actually received, $4,200, minus the *pro rata* amount earned, $1,000. The government would thus receive $3,200 back; and the student effectively would "receive" $800—the amount not yet paid and for which he is then not charged. Under the new Refund Regulation, the school must subtract the amount

of the student's unpaid charges—$800—from the amount the institution is otherwise entitled to retain—$1,000—and is left with only $200. The total refund to Title IV programs would then be $4,000—$4,200 actually received minus $200 retained by the institution.

The effect of the new regulation is to require the refund calculation to be made—in accord with the applicable method, here, *pro rata*—as *if* the student had paid his full obligation for the enrollment period. Thus, if the student has paid the full $1,000, the

---

**3.** The regulation does not apply to the *pro rata* calculation of § 1091b(b)(3), which is already statutorily defined.

**4.** State law and accrediting agency policies may often use different methods to calculate the re-

fund, *e.g.,* by applying various cut-off points during the enrollment period for set refund levels. The Refund Regulation does not affect the *method* of calculation.

refund will be identical under both the former and current regulation: under the former regulations, the institution retains $1,000, so the refund is $4000—$5000 actually received minus $1000; under the Refund Regulation, the unpaid scheduled cash payment is $0, so the institution retains $1,000, and the refund is again $4,000. But if, on the other hand, the student has not yet paid his full charges, the school's retained funds decrease by the unpaid amount.[5]

Appellants contend that because the Refund Regulation changes the amount the institution can retain, by requiring the institution to *add* to the refund the amount of the student's unpaid scheduled cash payment, it impermissibly modifies § 1091b(b)'s definition of a fair and equitable refund policy. Section 1091b(b) fully occupies the field of refund determinations and therefore compels the Secretary to accept as "fair and equitable" any determination made in accord with the provision. Two district courts have so held. *See California Cosmetology Coalition v. Riley*, 871 F.Supp. 1263, 1270–72 (C.D.Cal.1994); *Coalition of New York State Carrier Schools, Inc. v. Riley*, 894 F.Supp. 567, 571–72 (N.D.N.Y.1995).

While the regulation appears superficially to conflict with the statutory language, upon closer examination we are not persuaded by appellants' arguments. As indicated above, there is no issue if the student has paid the full amount of the enrollment period charges up front; the refund is identical under both § 1091b(b) and the Refund Regulation. The problem arises when the student has not yet

paid the enrollment charges for the relevant period. Then, as appellants contend, the Refund Regulation has the effect of "adding" the amount of the student's unpaid scheduled cash payments to the refund as calculated under § 1091b(b). However, *not* including the unpaid amount, as under the prior regulations, has the effect of constructively "refunding" that amount to the student—at the expense of the federal government—and of therefore crediting the refund to the student *before* the Title IV programs. This violates the explicit allocation requirements of § 1092(a)(1)(F).[6]

The two statutory provisions are thus in considerable tension as to the appropriate way to address unpaid student charges in the refund determination. But neither expressly addresses the situation; it appears that the draftsmen did not contemplate this scenario and its impact on the refund calculation. Section 1092(a)(1)(F), which provides that "refunds shall be credited" to the government before the student, suggests that the drafters presumed the student will have paid the charges to then be "refunded." Similarly, the language of § 1091b(a)—"Each institution ... shall have in effect a fair and equitable refund policy under which the institution refunds unearned tuition, fees, room and board, and other charges to a student who received [federal assistance]"—suggests that the drafters assumed that the student would pay the full charges for the enrollment period, such that *all* "unearned tuition" will need to be refunded. But § 1091b(b) does not on its face require the institution to include the student's unpaid charges in the

---

5. As can be seen in the table, under the Refund Regulation the amount the institution retains varies with the student's unpaid charges, while the amount refunded to the Title IV programs—and therefore the amount of Title IV assistance given to similarly-situated students—remains constant. The Title IV programs will receive a refund of $4,000 regardless of whether the student has paid $200 or $1,000, and therefore will not "make up the difference" for the student who has only paid $200. For sample calculations, see *Student Assistance General Provisions, Notice of Proposed Rulemaking*, 56 Fed.Reg. 66,496, 66,498 (1991).

6. For example, assuming the same scenario as in the table, *supra* at 8, under the former regulations, a student who paid the full $1000 would

not receive any refund. He therefore would have paid $800 more than the student who paid only $200, and $1,000 more than the student who paid nothing. The latter two students received a constructive "refund" of the amount not paid. That this is a "refund" can be seen more clearly by positing that a student who should have paid the $200 by the time he withdraws, has defaulted on that payment. Under the former regulations, the school would still be entitled to retain $1,000 and would refund only $3,000—$4,000 collected minus $1,000 retained; the student therefore receives the benefit of the $200 he never paid, for which the federal government pays through its reduced refund. The $200 can, not insensibly, be considered a "refund"—so may the $800 not yet paid.

refund calculation. We thus conclude that the statute is ambiguous as to how students' unpaid charges affect the refund determination.

Given this ambiguity, the Secretary has some discretion to resolve the apparent conflict between the two provisions. *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). The Secretary asserts that the Refund Regulation defines "unearned tuition" by requiring the institution to consider the full charges assessed for the enrollment period—not just the charges actually received—in calculating the refund. This in essence requires the institution to presume that the student has paid the full charges at the outset. If the total charges are $5,000, and the student has completed ⅕ of the course, it is logical that the "unearned tuition" is $4,000—the sum of the student's and the government's payment obligations. The Refund Regulation merely requires repayment of this full amount regardless of whether the student has paid his portion. The Regulation therefore does not "add" to the refund, as appellants allege, but merely treats all students—and the government—equally with respect to unpaid charges by defining the "unearned tuition" to which the refund policy must be directed.

That the Refund Regulation corrects the misallocation of refunds can be seen from the examples in the table, *supra*. Although the federal government paid $4,000 in all three scenarios, under the prior regulation it was refunded varying amounts—$3,000, $3,200, and $4,000. The student effectively received a corresponding "refund" of the amount he had not yet paid—$1,000, $800, and $0. This violated the refund crediting order of § 1092(a)(1)(F) by in effect allowing the institution to "refund" money to the student first. Under the current regulation, in contrast, the federal government receives the same amount, the full $4,000, in all three scenarios, prior to any refund to the student (who receives no refund in this example). And the

institution is only required to refund (up to) the *unearned amount of the full tuitional charge*—$4,000 ($5,000 full charge minus $1,000 "earned").

To be sure, the inevitable effect of the Refund Regulation is that institutions will retain less money *if* the student has not paid in full. The decrease in an institution's income is not, however, dispositive. While the statute clearly posits that institutions generally will retain *some* funds when a student withdraws, it does not delineate a precise amount and does not condition that amount on what the institution has actually received. Congress was focusing in § 1091b(b) on fairness and equity to the *students*—it is unusual, to say the least, for Congress to speak of fairness to the federal government. The Refund Regulation, by affecting the amount the *institution* retains, is not inconsistent with this policy. It essentially puts the risk of the student's "default" on the institution—which may be reasonable given that the institution has more control over the student's payments, but the statutory silence on unpaid charges makes that permissible. We thus conclude that the Secretary has permissibly interpreted these two statutory provisions to fulfill the mandates of both as closely as possible.[7]

### The Cohort Default Rate Rule

It is also alleged that the "Cohort Default Rate Rule" exceeds the Secretary's authority because it conflicts with various statutory provisions. In order to participate in Title IV programs, an institution must be both eligible and administratively capable. Eligibility requires that an institution be an institution of higher education and that it meet various program and administrative requirements, *e.g.*, that it use funds solely in accord with program provisions, that it provide information to the Secretary and other persons. 20 U.S.C. § 1094(a) (1990). The eligibility criterion upon which appellants focus examines the institution's cohort default

---

7. We disagree with the two district court opinions on which appellants rely—*California Cosmetology Coalition* and *Coalition of New York State Career Schools*—because they mischaracterize the regulation as adding to the refund rather than as addressing the problem of students' unpaid charges, and fail to consider the relation of § 1091b(b)'s refund *calculation* to § 1092(a)(1)(F)'s refund *allocation*.

rate—the percentage of students in default on federally insured loans in any given award year—for loan programs: "An institution whose cohort default rate is equal to or greater than [25%] for *each* of the three most recent fiscal years for which data are available shall not be eligible to participate in a program under this part for the fiscal year for which the determination is made and for the two succeeding fiscal years ..." 20 U.S.C. § 1085(a)(2) (1992) (emphasis added). In addition to these threshold eligibility requirements, an institution must be administratively (and financially) capable of participating in Title IV programs: "Notwithstanding any other [statutory] provisions ..., the Secretary shall prescribe such regulations as may be necessary to provide for— ... the establishment of reasonable standards of financial responsibility and appropriate institutional capability for the administration by an eligible institution of [Title IV programs]." 20 U.S.C. § 1094(c). Pursuant to this provision, the Secretary promulgated regulations that determine an institution administratively incapable of adequately administering Title IV programs (both loan and non-loan) if, *inter alia*, the institution has a cohort default rate of more than 25% for *any* of the three most recent fiscal years. 34 C.F.R. § 668.16(m)(1)(i) (1994). A determination that an institution has impaired administrative capability may affect its ability to secure an initial or renewal application and may result in a limitation of participation rights, *i.e.*, provisional certification for a period of one to three years.

Appellants allege that this regulation, the "Cohort Default Rate Rule," has "changed" the default rate measure from a violation in *each* of the three prior years as required by the eligibility provision, to *any* of the three prior years under the administrative capability regulation. This puts an institution at "heightened" risk of losing its participation under the Secretary's administrative capability regulation even though it meets the eligibility requirements. This modification has additional significance, appellants claim, in

that the regulation permits the Secretary to provisionally certify an institution when it is prohibited by the statute, which allows provisional certification only when an institution is seeking an initial or renewal certification, is having its administrative capability determined for the first time, or has undergone a change of ownership. 20 U.S.C. § 1099c(h). Appellants also point out that the regulation neglects to provide the statutory notice and hearing protections for the limitation or termination of participation in Title IV programs, 20 U.S.C. § 1094(c)(1)(F) (1990), and the statutory appeal rights for loss of eligibility, 20 U.S.C. § 1085(a)(2). Thus, by first placing an institution on provisional certification—equivalent to a "limitation" of participation, and then revoking that certification—equivalent to a loss of eligibility, the Secretary effectively can terminate an institution's participation without providing these statutorily required procedural protections.

The Secretary counters that he has express statutory authority to establish "reasonable standards of ... appropriate institutional capability" for the Title IV programs, 20 U.S.C. § 1094(c)(1)(B), and to "establish procedures and requirements relating to the administrative capabilities of institutions," based on, *inter alia*, "consideration of past performance of institutions ... with respect to student aid programs," 20 U.S.C. § 1099c(d)(1) (1992). It was pursuant to his authority under these provisions—*not* § 1085(a)(2)—that the Secretary promulgated the administrative capability regulations. Section 1085(a)(2) addresses eligibility, not administrative capability, and has distinct, if overlapping, coverage of loan programs. The 25% default rate criterion, evaluated over three years, is a reasonable measure of a school's administrative performance.[8]

The statutory provisional certification limitations are no bar to the regulations, the Secretary asserts, because he will only provisionally certify an institution on the basis of administrative incapability in accord with these limitations, *i.e.*, at an initial or renewal

---

8. The Secretary also notes that the 25% rate over a three year period was actually a relaxation of the standard from a 20% rate for any one year. That the numerical rate is identical to that of the

eligibility provision—which the 1992 Amendments gradually decreased to 25%—is thus fortuitous.

application, change of ownership, or first determination. And such an initial or renewal certification, it is argued, would not fall under the terms of § 1094(c), which requires notice and a hearing, because it would not limit or terminate Title IV "participation"—which the Secretary interprets to mean current, full participation. Provisional certification of an institution during the pendency of a current certification, in contrast, can only be accomplished through an affirmative administrative action, which would be subject to the notice and hearing requirements of § 1094(c) and the appeal rights of § 1085(a)(2). As to revocation, the statute itself provides for termination without procedural protections: "If, prior to the end of a period of provisional certification under this subsection, the Secretary determines that the institution is unable to meet its responsibilities under its program participation agreement, the Secretary may terminate the institution's participation." 20 U.S.C. § 1099c(h)(3). This provision does not require the procedural protections of §§ 1094(c) and 1085(a)(2), and the Secretary therefore asserts that he has discretion to select appropriate procedures. He has done so by providing that an institution will have an opportunity to be heard in an administrative review process before an independent official, 34 C.F.R. § 668.13(f).

■ We note that the statutory structure indicates that "eligibility" is not synonymous with "administrative capability"—which the Secretary is expressly authorized to define—and this alone suggests that the Secretary's independent construction of administrative capability to include a 25% default rate criterion is permissible. And the prevention of student defaults can reasonably be thought one indication of an institution's "past performance ... with respect to student aid programs." That administrative capability and eligibility both examine default rates—and that administrative capability could be con-

strued as one factor in determining eligibility—does not preclude the Secretary from choosing a different measure for the former. The two criteria are distinct; administrative capability is a broader concept than eligibility both in its scope of application, *i.e.*, all Title IV, HEA programs rather than just loan programs, and in the range of factors it incorporates.

■ We find more troubling appellants' argument that the Secretary should not be able to do in two steps what he cannot do in one: terminate an institution's participation without certain procedural protections. Although the Cohort Default Rate Rule itself is silent as to when evaluation of administrative capability occurs, we will accept the Secretary's interpretation of the regulation as allowing him only to exercise his authority to provisionally certify institutions in accord with the statutory limitations. It then follows logically—as the Secretary contends—that institutions subject to provisional certification under § 1099c(h) as initial or renewal applications are not entitled to the notice and hearing and the appeal requirements. Such applicants are not "participating" in a Title IV program and do not possess any current "eligibility" that can be lost. To conclude otherwise would create in effect an "entitlement" to certification—for without positing such an entitlement, which the statute does not provide, there is no valid argument that an *applicant* has a "right" to procedural protections granted *participating* institutions. On the other hand, the Secretary concedes that the disputed procedural protections *do* apply to a change from full to provisional certification of a currently participating institution.

As to the "second step" of termination of provisional certification, the Secretary's decision not to provide notice and hearing or appeal rights based on § 1099c(h)(3)'s silence—when Congress has specified procedures elsewhere—is not impermissible.[9]

9. We are told by the Secretary that the 1992 amendments removed a provision that required all administrative hearings to be "on the record," *i.e.*, with oral hearings. Under the new regulations, this hearing procedure is preserved for fully certified institutions, but only a written administrative review is allowed provisionally certified, "high risk" institutions. We are also informed that while the term "provisional certification" was incorporated in the HEA for the first time by the 1992 amendments, it stems from a prior statutory provision—and administrative practice—allowing the Secretary to enter into "limitation agreements" that provide fewer par-

That section does not cross-reference § 1094(c) or § 1085(a)(2), and it provides no express procedural protections. While § 1099c(h)(3) does refer to the Secretary's termination of an institution's "participation," what is being terminated is not the full participation assumed in §§ 1094 and 1085(a)(2), but participation that has already been limited based on an evaluation of the risk of continued Title IV funding for a particular institution. And as the Secretary noted at oral argument, a provisionally certified institution merely has one level of administrative review rather than two. Absent any due process concerns, the Secretary's interpretation of § 1099c(h)(3) as establishing a separate standard for termination of provisional certification is permissible.

### The Thirteen Week Rule

■ We can more easily dispense with the claim that the "Thirteen Week Rule" is arbitrary and capricious. The HEA requires that institutions have a 70% placement rate for their graduates "as determined under regulations of the Secretary." 20 U.S.C. § 1088(e)(2)(A) (1992). Pursuant to this provision, the Secretary promulgated the "Thirteen Week Rule," which requires that institutions calculate the placement rate for any award year based on "the number of students who, within 180 days of the day they received their degree, ... obtained gainful employment ... and, on the date of this calculation, are employed, or have been employed, for at least 13 weeks following receipt of the credential from the institution." 34 C.F.R. § 668.8(g)1(ii) (1994). Appellants contend that this regulation is arbitrary and capricious because it will be "virtually impossible" to meet. If a school has to calculate the placement rate at the end of the award year, it will have insufficient time to determine whether its graduates have obtained employment within 180 days and maintained that employment for 13 weeks, a total of about 270 days.

But the Secretary points out that this "virtual impossibility" is based on a misreading of the statute; the calculation of the placement rate is to be made not at the end of the award year, but at the yearly audit, within 120 days after the *fiscal* year ends. This allows the institution to look to the post-graduation time period to determine placement. We think this explanation entirely reasonable, and indeed, the auditing provision is explicitly referenced in the placement rate regulation. We nevertheless were concerned by the possibility that some institutions might be caught with insufficient time to calculate the placement rate by the timing of the end of their fiscal year. But, the Secretary represented at oral argument that he would not find a violation nor impose a penalty if the sole reason that an institution was unable to document its placement rate at the time of the audit was that 270 days had not yet elapsed.

### The Five Day Rule

■ The Five Day Rule, which applies to non-term based, credit hour (vocational) schools, defines a "week of instructional time to be any week in which at least 5 days of regularly scheduled instruction, examinations, or preparation for examinations occurs ..." 34 C.F.R. § 668.2(b) (1994). Appellants argue that the Five Day Rule is unreasonable because there is no evidence in the record to support the rule, and the severe effect on evening students is not justified by the statute. The Secretary asserts that his interpretation is due *Chevron* deference because the statutory term "week of instruction" is not defined,[10] and emphasizes that the DOE considered all relevant factors and important aspects of the problem, gave an explanation consistent with the evidence, and provided a reasonable interpretation of the statute. We agree with the Secretary that the Five Day Rule is not arbitrary and capricious. The record contained indications that certain non-term based, credit hour institutions abused the definitions of full-time stu-

ticipation rights to the institution. This regulatory background and experience provide additional support for the Secretary's construction of the provisional certification process.

**10.** 20 U.S.C. § 1088 sets minimum weeks of instructional time for program eligibility, but does not define such a week.

dent and academic year. Furthermore, the effect of the regulation was ameliorated by the Secretary's interpretation—which we must accept because not inconsistent with the regulation—allowing institutions to receive credit for each week of instruction on a *pro rata* basis, *i.e.*, with only four days of instruction per week, an institution could receive credit for 80% of a week's worth of instruction.

 Appellants also assert that the February 29 Proposed Rule gave insufficient notice that the Secretary was considering defining a "week of instruction" as five days of class. The Proposed Rule had a "one day rule" for all institutions—defining a week of instruction as any week with one day of class—that supposedly would allow creative and innovative programs, yet "not open the door to abuse." 59 Fed.Reg. at 9,529–30. Appellants acknowledge that the Proposed Rule noted concerns with abuse, but contend that the reference was insufficient to put the public on notice that such a dramatic change in the definition of "week of instruction" was contemplated. The statements were ambiguous, and were obscurely located in the preamble under the definition of full-time student. And while commenters referred to possible abuse of a one day rule, the Secretary cannot change the regulation based solely on comments received. The Five Day Rule, it is argued, was therefore not a "logical outgrowth" from the Proposed Rule. *Chocolate Mfrs. Ass'n v. Block,* 755 F.2d 1098, 1102–05 (4th Cir.1985).

Contrary to appellants' efforts to find ambiguity and obscurity, the February 28 notice explicitly stated that the Secretary was concerned with possible abuse of the definition of academic year and full-time student, and "request[ed] comments on whether, to further address this potential abuse, he should also establish a weekly minimum full-time workload for educational programs that are measured in credit hours but do not use academic terms." 59 Fed.Reg. at 9,530. The statements were logically placed in the discussion of the definitions of statutory terms, and more particularly under a term dealing with workload requirements—"full-time student." *Cf. MCI Telecommunica-*

*tions Corp. v. FCC,* 57 F.3d 1136, 1141–42 (D.C.Cir.1995) (statements provided insufficient notice when placed in a footnote to the background section, appended to a discussion of a completely separate topic). These statements were sufficient to apprise the public, at a minimum, that the issue of the definition of a full-time workload—possibly through the definition of academic year—was on the table. That the Proposed Rule described the one day rule approvingly does not undermine the notice to interested parties that the rule was subject to modification, particularly in light of adverse comments, as received by the Secretary here. *Chocolate Mfrs. Ass'n,* 755 F.2d at 1107; *City of Stoughton v. EPA,* 858 F.2d 747, 753 (D.C.Cir.1988). The change from a one day rule to the Five Day Rule, while not insubstantial, was a "logical outgrowth" from the Proposed Rule's express concerns.

\* \* \* \* \* \*

The district court's summary judgment in favor of Secretary Riley is therefore

*Affirmed.*