**CAREER COLLEGE ASSOCIATION, et al., Appellants,**

v.

**Richard W. RILEY, Secretary of the United States Department of Education, Appellee.**

No. 94–5270.

United States Court of Appeals, District of Columbia Circuit.

April 23, 1996.

On Petition for Rehearing.

Before: SILBERMAN, GINSBURG, and HENDERSON, Circuit Judges.

Opinion for the Court filed by Circuit Judge SILBERMAN.

SILBERMAN, Circuit Judge:

Career College Association petitions for rehearing of our determination that the refund regulation, 34 C.F.R. § 668.22(g) (1994), is a reasonable interpretation of conflicting statutory mandates. The Association contends that there is no "tension" between 20 U.S.C. § 1091b(b) (1994) and 20 U.S.C. § 1092(a)(1)(F) (1994), and that the Secretary's prior interpretation of § 1091b(b) did not result in a constructive refund to the student. It is also alleged that the Secretary's explanation before us was an impermissible post-hoc rationalization. We deny the petition.

The Association primarily repeats its argument—which we think unpersuasive—that under *Chevron I,* § 1091b(b) completely defines the appropriate refund, so there is no statutory tension with § 1092(a)(1)(F) that would allow the Secretary to fill an interpretive gap. However, petitioner also notes that our assumption that Title IV funds are generally paid "up front" was incorrect. Such funds typically are paid in advance for the majority of students at four-year colleges and universities; aid is calculated on a yearly basis, but the student's obligation to pay— and the disbursement of federal funds—is by semester. (This timing is subject to the caveat that the first payment for first-time students is delayed until 30 days after the start of classes. 34 C.F.R. § 668.165(c)(3) (1995).) In contrast, trade schools often receive Title IV funds in two installments during the term, but this is due largely to the common practice of having year-long or program-long terms, as opposed to semesters. Be that as it may, our analysis remains unchanged. As the Secretary notes, the refund regulation's calculation is not affected by any unpaid charges of the *government*; it looks only to the *student's* unpaid charges. *See* 34 C.F.R. § 668.22(g)(2)(ii) (excluding "[a]ny amount scheduled to be paid by Title IV, HEA" funds from the calculation of the "scheduled cash payment" that determines how much an institution may retain).

■ The Association also argues—in what in effect is a recharacterization of its "no tension" theory—that there were no constructive refunds to the student under the prior regulation, so § 1092(a)(1)(F)'s refund

crediting order was not implicated. This assertion turns on the student's obligation to repay the full amount of the loan to the Title IV lender. In our example, *see Career College Ass'n v. Riley,* 74 F.3d 1265, 1270 (1996), when students paid $1,000, $200, and $0, under the prior regulation the refund to the government would be $4,000, $3,200, and $3,000, respectively. We therefore concluded that the balance of the $1,000 owed by the student, which the institution retained from Title IV funds, was a constructive refund. But the Association contends that this is not a refund because the three students must now pay $0, $800, and $1,000, respectively, to the Title IV lender. So each student, after paying off the loan, ultimately will be treated "equitably." This argument, however, misses the central purpose of § 1092(a)(1)(F). That the student must eventually repay the government does not mean that there is no "refund" from the *school* to the *student;* § 1092(a)(1)(F) requires the *school* to pay the *government* first—it does not allow the school to assume that the government will be repaid indirectly via the student. The refund regulation thus functions to ensure that the government is paid the full $4,000 first, regardless of the amount already contributed by the student—or in other words, that the institution earns money from the student first. As the government admits—and the Association laments—this shifts the risk of noncollection from Title IV lenders to the institution, which is better able to screen students. The Secretary concedes that this may lead schools to require students to pay in advance, preventing some students from enrolling, but finds this a perhaps inevitable effect of attempts to cure abuse, that in fact may be beneficial if a student is a poor loan risk. Moreover, the Association itself has indicated that even under the prior regulation, the student remained obligated to the lender for the full amount of funds, so the main hardship would be one of timing. But schools, competing for students and Title IV funds, are free to decide how to approach this issue.

█ It is also argued that the Secretary's explanation is a post-hoc rationalization not entitled to deference, since when the refund regulation was devised, §§ 1091b(b) and 1092(a)(1)(F) were not yet enacted and therefore could not create statutory tension for the Secretary to resolve. But the Secretary has consistently explained the regulation as addressing the precise problem left unanswered by the statutory provisions—the treatment of unpaid charges in the refund calculation. That Congress chose not to resolve that issue by statute does not bar the Secretary from resolving it in the same manner as before, particularly where there is nothing in the amendments to suggest the interpretation is impermissible.

\*　　\*　　\*　　\*　　\*　　\*

Accordingly, the petition for rehearing is denied.

*So ordered.*