**CALIFORNIA COSMETOLOGY COALITION; American Association Of Cosmetology Schools, Plaintiffs–Appellees,**

v.

**Richard W. RILEY, Secretary of Education, Defendant–Appellant.**

No. 96–55314.

United States Court of Appeals, Ninth Circuit.

Submitted Nov. 4, 1996.

Decided April 11, 1997.

Jeffrica J. Lee, United States Department of Justice, Washington, D.C., for defendant-appellant.

Leslie H. Wiesenfelder, Dow, Lohnes & Albertson, Washington, D.C., for plaintiffs-appellees.

George P. Ritter, Sacramento, California, for amicus.

Before: BROWNING, THOMPSON and THOMAS, Circuit Judges.

THOMAS, Circuit Judge.

This case concerns regulations promulgated by the Secretary of Education (the "Secretary") in 34 C.F.R. § 668.22 governing the amount of tuition and other fees postsecondary schools must refund when a student receiving Title IV federal aid withdraws from classes before completing the term for which those fees have been charged. The district court found the regulations contradicted 20 U.S.C. § 1091b, the section of the Higher Education Act ("HEA") they were intended to implement, and entered a permanent injunction against their enforcement. We affirm.

## I.

Title IV of the HEA, as amended, 20 U.S.C. §§ 1070–1099, established need-based federally funded student financial aid programs for college and postsecondary vocational training. Title IV programs include grant funds, which students do not have to repay, such as the Federal Pell Grant Program and the Federal Supplemental Educational Opportunity Grant Program, as well as loan funds, which students do have to repay, such as the Federal Stafford Loan Program and the Federal Perkins Loan Program.

Concerned by the widening gap between the escalating costs of higher education and students' ability to pay those costs, Congress amended the HEA, enacting the Higher Education Amendments of 1992 (the "1992 Amendments") to address the problem. H.R.Rep. No. 447, 102d Cong., 2d Sess. 6–9 (1992), reprinted in 1992 U.S.C.C.A.N. 334, 339–42. The 1992 Amendments also sought to make program administration more equitable for students. H.R.Rep. No. 447, 102d Cong., 2d Sess. 10, 79 (1992), reprinted in 1992 U.S.C.C.A.N. 334, 343, 412. To this end, the 1992 Amendments require all schools participating in Title IV programs to develop a "fair and equitable" policy to refund a portion of the tuition paid by Title IV-assisted students withdrawing from classes before completing the period of enrollment for which the tuition has been paid. Pub.L. No. 102–325, § 485(a), 106 Stat. 448, 619–20 (1992) (codified at 20 U.S.C. § 1091b).

Congress established specific minimum criteria by which a policy could be determined to be "fair and equitable":

The institution's refund policy **shall be considered to be fair and equitable** for purposes of this section if that policy provides for a refund in an amount of at least the largest of the amounts provided under—

(1) the requirements of applicable State law;

(2) the specific refund requirements established by the institution's nationally recognized accrediting agency and approved by the Secretary; or

(3) the pro rata refund calculation described in subsection (c) of this section, except that this paragraph will not apply to the institution's refund policy for any student whose date of withdrawal from the institution is after the 60 percent point (in time) in the period of enrollment for which the student has been charged.

20 U.S.C. § 1091b(b) (emphasis added).

Thus, to satisfy the "fair and equitable" requirement of § 1091b(b), schools must, at a minimum, refund the largest of: (1) the refund required by state law; (2) the refund required by an accrediting agency's Secretary-approved refund policy; or (3) if the student is a first-time student who drops out before completing more than 60% of his program, the pro rata refund provided in 20 U.S.C. § 1091b(c).[1] At present, only the first and third of these calculations need be made because the Secretary has not yet approved any accrediting agency's refund policy, making § 1091b(b)(2) currently inoperative.

The 1992 Amendments further require that the refund be paid first to reimburse Title IV loan programs, then to Title IV grant programs, to other sources of aid (e.g.,

---

1. If none of these applies-if there is no state law regarding refunds, no approved accrediting agency policy, and the student does not qualify for a pro rata refund-the Secretary requires the school to refund the larger of: (1) the school's refund policy; or (2) the Federal refund provided in 34 C.F.R. § 668.22(d). 34 C.F.R. § 668.22(b)(1)(iv). The Appellees challenged this Federal refund below but did not appeal the district court's decision to uphold the regulation.

state government programs), and last to the student. 20 U.S.C. § 1092(a)(1)(F).

On December 23, 1991, prior to enactment of the 1992 Amendments, the Secretary published a Notice of Proposed Rulemaking. He proposed amending 34 C.F.R. § 668.22, the regulation governing institutional refunds for withdrawn students, to change the definition of the "institutional refund" a school must pay when a student receiving Title IV assistance withdraws before completing the program for which the Title IV assistance was provided. 56 Fed.Reg. 66,496, 66,498 (1991). After several iterations, the Secretary published Final Regulations on November 29, 1994, which adopted in substance the Secretary's December 23, 1991 proposal. 59 Fed. Reg. 61,142 (1994) ("the Final Regulations").

Rather than simply effecting the statutory scheme, the Final Regulations utilize an entirely different method of computing the amount of money schools can retain upon student withdrawal. Under the Secretary's formula, institutions are to calculate the appropriate refund using the method prescribed in the 1992 Amendments. The institutions are then mandated to subtract from the retainage any amounts still owed either from the student to the school or from the government to the student as financial aid. 34 C.F.R. § 668.22(g)(2)(iii). These amounts owed are termed "unpaid scheduled cash payments." Under the Final Regulations, schools must deduct unpaid scheduled cash payments from the amount they may retain to pay for tuition and fees incurred by withdrawn students, thereby in effect adding the unpaid scheduled cash payment to the amount they must refund.[2] "Scheduled cash payment" is defined in pertinent part as:

> the amount of institutional charges that has not been paid by financial aid for the period of enrollment for which the student has been charged, exclusive of—
>
> (A) Any amount scheduled to be paid by Title IV, HEA program assistance that the student has been awarded that is payable to the student even though the student has withdrawn....

*Id.* § 668.22(g)(2)(ii).

Under this definition, an unpaid scheduled cash payment could include two types of unpaid charges: (1) amounts students had agreed to pay out-of-pocket but had not yet paid; and (2) any disbursements of financial aid that were scheduled to have been paid sometime after the date the student withdrew to which the student had not become entitled before withdrawing.

The essential purpose of this additional requirement is cost-shifting from the government to the institution and the student. Under the prior regulations, an institution would not have to seek reimbursement from the withdrawing student for amounts owed because it could simply retain the Title IV funds it had already received on behalf of the student. Under the Final Regulations, the school would have to include in its reimbursement to the government the amount still owed by the student. The institution would then have to pursue the student for the unpaid sums. All parties concede that for some students receiving full grants, the implementation of this regulation can have the unfortunate effect of converting grant funds into personal debt.

A simple hypothetical example will illustrate the change in the regulations. Assume students A and B attend the same school, are enrolled in the same program, and have the same financial aid package. The program cost is $3000, of which Students A and B are expected to pay $500 out-of-pocket, the remaining $2500 to be covered by Title IV assistance. Both students drop out on the same day. The school had already received the $2500 Title IV payment on behalf of each student. Student B had paid the $500 sometime before withdrawing, while Student A had paid nothing. Assume further that the applicable refund policy permits the school to retain $1500 per student to pay for the period they had attended the school. Under the previous refund regulations, the school would base the amount of the refund on whatever

---

**2.** However, because 20 U.S.C. § 1091b(c)(1) defines the "pro rata refund" as an amount *excluding* any unpaid charges owed by the student, the Secretary indicated that the regulations, which require excluding unpaid charges from the amount an institution may retain and thus *including* unpaid charges in the refund, had been superseded and was inapplicable in the case of the pro rata refund only. *See* 59 Fed.Reg. 9526, 9555 (1994).

payment it had received by the time the student withdrew-it would refund the difference between what it was permitted to retain and the payment it had already received for the student. The school had received $2500 for Student A, all in Title IV assistance, and $3000 for Student B, $500 from the student and $2500 from Title IV. The school would therefore refund $1000 to Title IV for Student A and $1500 to Title IV for Student B. Student A will have attended the school for free, Title IV having covered the entire cost, whereas Student B will have paid $500, even though both students had the same financial aid package.

Under the Final Regulations, the school would be permitted to retain $1500 for Student B, the $1500 the applicable refund policy permits it to retain minus the $0 balance remaining on Student B's account, but only $1000 for Student A, $1500 minus the $500 balance remaining on Student A's account. The institution would refund $1500 to Title IV for both Students A and B and then bill Student A for the $500 balance remaining on his account.

To summarize, the Final Regulations require institutions to:

(1) calculate all three refunds listed in § 1091b(b), to the extent they are applicable; 34 C.F.R. § 668.22(b)(3)

(2) pick the calculation that requires the largest refund, or pick the institution's own refund policy if that policy provides for a larger refund than all three calculations; 34 C.F.R. § 668.22(b)(3)

(3) subtract the unpaid scheduled cash payment from the amount that calculation or institutional refund policy permits the institution to retain; 34 .C.F.R. § 668.22(g)(2)(iii) .

(4) in accordance with the allocation scheme of § 1092(a)(1)(F), refund the difference between the amount the institution has received as payment for the student and the amount the institution may retain as calculated in (3); 34 C.F.R. § 668.22(h)

By contrast, the 1992 Amendments, as presently effective, provide that the institution's policy "shall be considered to be fair and equitable" if the school refunds the larger of the refund required by state law or, if the student is a first-time student who drops out before completing more than 60% of his program, the pro rata refund provided in 20 U.S.C. § 1091b(c). 20 U.S.C. § 1091(b).

## II.

The California Cosmetology Coalition and the American Association of Cosmetology Schools (the "Coalition") brought this suit against the Secretary seeking a permanent injunction against enforcement of the Final Regulations. The Coalition claimed that excluding unpaid charges from the amount institutions may retain has the effect of adding unpaid charges to the amount schools must refund. Therefore, the Coalition argued, the Final Regulations contradict the express language of the 1992 Amendments by requiring institutions to refund a larger amount than is required under state or accrediting agency refund standards. The result is that an institutional refund policy that meets the standards set forth in 20 U.S.C. § 1091b(b) for a "fair and equitable" refund policy is insufficient under the regulatory definition of "fair and equitable."

The district court agreed and issued a preliminary injunction. *California Cosmetology Coalition v. Riley*, 871 F.Supp. 1263 (C.D.Cal.1994). The court concluded that the Coalition was likely to prevail on the merits because

[n]owhere in § 1091b does Congress state that the actual calculation of the refund under state law or accrediting agency policy must, or even may, include unpaid scheduled cash payments to constitute a "fair and equitable" refund under the statute.... By promulgating regulations which increase the minimum "fair and equitable" refund under the 1992 Amendments by the unpaid amount of scheduled cash payments, the Secretary has effectively rewritten what is "fair and equitable" under § 1091b(b) and violated the clear and unambiguous statutory language.

*Id.* at 1270. The district court reasoned that requiring schools to exclude unpaid charges from the amount they may retain, and therefore adding unpaid charges to the amount they must refund, "necessarily adds 'something which is not there' to the explicit lan-

guage of the 1992 Amendments" and exceeds the Secretary's authority. *Id.* (quoting *United States v. Calamaro,* 354 U.S. 351, 359, 77 S.Ct. 1138, 1143, 1 L.Ed.2d 1394 (1957)).

The district court later granted the Coalition's motion for summary judgment and entered a permanent injunction against enforcement of the regulations requiring institutions to exclude unpaid charges from the amount they may retain and thereby increasing by the amount of unpaid charges the amount they must refund. The Secretary timely appealed.

### III.

We review a grant of summary judgment *de novo. Alliance Against IFQs v. Brown,* 84 F.3d 343, 345 (9th Cir.1996). If the intent of Congress is clear from the face of the statutory language, we must give effect to the unambiguously expressed Congressional intent. *Chevron, U.S.A., Inc. v. Natural Resources Defense Council,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984). Indeed, "if the intent of Congress is clear, that is the end of the matter." *Id.* at 842, 104 S.Ct. at 2781.

On its face, the language of the 1992 Amendments seems clear. Congress required institutions to develop "fair and equitable" refund policies, then specified that "the institution's refund policy **shall be considered to be fair and equitable**" if the policy provided for a refund satisfying certain statutory criteria. 20 U.S.C. § 1091(b) (emphasis added). The Coalition contends that if a school's refund policy meets the statutory criteria, then as a matter of law it must be "fair and equitable."

The Secretary argues that the statute is ambiguous and his interpretation must therefore control. "[I]f the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Chevron,* 467 U.S. at 843, 104 S.Ct. at 2782.

In defending his regulations, the Secretary focuses on the word "unearned" in § 1091b(a). The Secretary argues that while § 1091b(a) requires that an institution have a "fair and equitable" refund policy to refund *"unearned"* tuition and other charges, the

word "unearned" is undefined in the HEA. Given this legislative gap, the Secretary claims he is entitled to define what funds are "unearned" because Congress delegated the Secretary authority to promulgate regulations implementing the HEA, including the 1992 Amendments. *See* 20 U.S.C. § 1098a(b). The Secretary believes the term "unearned" in § 1091b(a) requires consideration of the total charges assessed to the student rather than merely what payment the school had already received by the time the student withdraws. Because § 1092(a)(1)(F) provides that federal aid programs are the first to be repaid from any refund calculated in § 1091b(b) and that students are the last to be repaid, the Secretary considers federal aid funds to be "unearned" until the institution first earns its payments from all other sources, the first such source being whatever the student is obligated to pay out-of-pocket. Consistent with this definition of "unearned," and looking at the total charges assessed the student, the Final Regulations require that a refund must equal the unearned portion of the total charges assessed, and that is calculated by adding unpaid charges to the refund calculated in § 1091b(b). This treats the refund calculation as if the student had already paid his out-of-pocket share and thereby ensures that student funds are earned first. The Secretary argues the Court should accord *Chevron* deference to his definition of "unearned" and his interpretation of the 1992 Amendments.

In short, the Secretary argues there is a conflict between § 1091b(b) and § 1092(a)(1)(F) because without adding unpaid charges to the institutional refund, students who did not pay their out-of-pocket share before withdrawing will never have to pay that share, as under the previous regulations. Their share will be paid by Title IV funds, and the students will have received a "constructive refund" of the amount they were obligated to pay out-of-pocket in violation of the refund order prescribed in § 1092(a)(1)(F). The Secretary argues this Court should defer to his decision regarding how best to solve the apparent conflict between the two sections.

The D.C. Circuit accepted this argument and upheld the validity of the refund regulations in *Career College Ass'n v. Riley*, 74 F.3d 1265, 1270–72, *opinion on denial of reh'g*, 82 F.3d 476 (D.C.Cir.1996). The court found that § 1091b(b) and § 1092(a)(1)(F) are "in considerable tension as to the appropriate way to address unpaid student charges in the refund determination. But neither expressly addresses the situation[.]" *Career College Ass'n*, 74 F.3d at 1271. Congress had overlooked the impact of unpaid charges on the refund calculation, the court thought, because it had assumed that students would have already fulfilled their obligations to the school, so there would be no unpaid charges. *Id.* Finding ambiguity as to how students' unpaid charges affect the refund determination, the court deferred to the Secretary's definition of "unearned" tuition and other charges. *Id.* at 1272. "The Regulation … does not 'add' to the refund … but merely treats all students-and the government-equally with respect to unpaid charges by defining the 'unearned tuition' to which the refund policy must be directed." [3] *Id.* The court referred to and expressly disagreed with the district court's decision in this case and with the Northern District of New York's decision also invalidating the regulations in *Coalition of New York State Carrier Schools, Inc. v. Riley*, 894 F.Supp. 567, 571–72 (N.D.N.Y.1995), believing they "mischaracterize the regulation as adding to the refund rather than as addressing the problem of students' unpaid charges, and fail to consider the relation of § 1091b(b)'s refund *calculation* to § 1092(a)(1)(F)'s refund *allocation*." *Career College Ass'n*, 74 F.3d at 1272 n. 7.

The district court in this case found § 1091b to be clear and unambiguous on its face in defining the minimum refund that would be considered to be "fair and equitable." *California Cosmetology*, 871 F.Supp. at 1270. The court held that § 1092(a)(1)(F) merely establishes the order in which the refund calculated in § 1091b(b) must be repaid rather than defines "unearned" to include unpaid charges.

**3.** The D.C. Circuit and the Secretary seem to imply that the 1992 Amendments require fair and equitable refunds to the government. It

■ We agree with the district court that Congress unambiguously meant what it said. The statutory language could hardly be more clear. Section 1091(b) lists three criteria for when an institution's refund policy will "be considered fair and equitable." If Congress wished to add additional criteria, it could have done so explicitly. There is no ambiguity in the statute, and the Secretary's emphasis on the word "unearned" in § 1091b(a) is not persuasive. Section 1091b(a) states that "[e]ach institution of higher education … shall have in effect a fair and equitable refund policy under which the institution refunds unearned tuition [and other fees]. …" A "fair and equitable refund policy" is therefore at the very least one which refunds unearned tuition and other fees. Because § 1091b(b) lists three criteria for when an institution's refund policy will be considered "fair and equitable," a policy that meets one of those criteria necessarily must be refunding unearned tuition and other fees. Congress did not leave it to the Secretary to define "unearned" tuition and other fees. Section 1091b dictates what the refund is and § 1092(a)(1)(F) prescribes to whom it must be paid.

The Secretary's argument requires a finding that § 1092(a)(1)(F) modifies the refund calculations of § 1091b(b). In *Mead Corp. v. Tilley*, 490 U.S. 714, 109 S.Ct. 2156, 104 L.Ed.2d 796 (1989), the Court addressed a similar question. When an employee benefit plan terminates, all accrued benefits automatically vest and must be paid from plan funds to the extent funds are available. *Id.* at 717, 109 S.Ct. at 2159. Section 4044(a) of the Employment Retirement Income Security Act of 1974 ("ERISA") provides the order of priority for payment of benefits when a benefit plan terminates: first to nonforfeitable benefits guaranteed by the Pension Benefit Guaranty Corporation, § 4044(a)(1)–(4); then to "all other nonforfeitable benefits under the plan," § 4044(a)(5); and finally to "all other benefits under the plan," § 4044(a)(6). *Id.* at 717–18, 109 S.Ct. at 2159–60. Any funds remaining after these benefits have been paid may be recouped by the employer.

does not. As the Secretary conceded at oral argument, § 1091b(a) only requires that refunds *to students* be "fair and equitable."

*Id.* at 718, 109 S.Ct. at 2160. The plaintiffs argued that although their benefits were not "accrued," they were "benefits under the plan" under § 4044(a)(6) and should have been paid before funds were recouped by the employer. *Id.* at 721–22, 109 S.Ct. at 2161. Relying in part on the section's placement in the ERISA statute and the lack of any legislative history indicating the section was intended to create new entitlements, the Court disagreed, holding that § 4044(a)(6) is a distribution mechanism for benefits created elsewhere rather than a source for new entitlements. *Id.* at 722–24, 109 S.Ct. at 2161–63.

Similarly, § 1092(a)(1)(F) is a distribution mechanism for the refund calculated elsewhere, in § 1091b(b). Section 1092(a)(1)(F) is located in a subsection entitled "Information dissemination activities," hardly where one would expect to find a provision that modifies the refund for withdrawn students that is dealt with in an entirely different section appropriately entitled "Institutional refunds." Further, § 1092(a)(1)(F) requires an institution to provide students with "a statement of the refund policy of the institution, *as determined under section 1091b of this title,* for the return of unearned tuition and fees ... which refunds shall be credited in the following order ...." § 1092(a)(1)(F) (emphasis added). This language clearly suggests that the distribution scheme of § 1092(a)(1)(F) is merely intended to operate upon whatever amount is calculated under § 1091b(b) rather than to modify that amount in any way.

Absent statutory ambiguity, the agency is not owed *Chevron* deference and the express statutory language must control. Because we find the statutory language unambiguous, we need not decide whether the Secretary's interpretation of the statute was impermissible, as the Coalition argues. *See Chevron,* 467 U.S. at 842–43, 104 S.Ct. at 2781–82.

### IV.

It is not sufficient to surmise, as did the D.C. Circuit, that Congress inadvertently overlooked the problem of unpaid charges and would have drafted § 1091b(b) differently had it been aware of the problem. "We must presume that Congress acts with deliberation, rather than by inadvertence, when it drafts a statute." *United States v. Motamedi,* 767 F.2d 1403, 1406 (9th Cir.1985). Moreover, the Secretary himself argues that, in fact, Congress *was* aware of the problem because the proposed regulations published on December 23, 1991 detailed the problem of unpaid charges and the Secretary's suggested solution of requiring institutions to exclude unpaid charges from the amount they may retain, thereby *adding* unpaid charges to the refund. In spite of this knowledge, Congress directed institutions to *subtract* the unpaid charges in calculating the pro rata refund but did not require adjustments for unpaid charges in any of the other subsections of § 1091b(b). It cannot be said Congress "presumed the student will have paid the charges to then be 'refunded,' " *Career College Ass'n,* 74 F.3d at 1271, because the pro rata refund expressly deals with unpaid charges.

### V.

The Secretary raises other arguments, but all are dependent upon a finding of statutory ambiguity where none exists. The plain fact is that the 1992 regulations embrace a fundamentally different criteria for determining a "fair and equitable refund" from the one Congress expressly provided.

A regulation may not serve to amend a statute, *Koshland v. Helvering,* 298 U.S. 441, 447, 56 S.Ct. 767, 770, 80 L.Ed.1268 (1936), nor add to the statute "something which is not there." *United States v. Calamaro,* 354 U.S. 351, 359, 77 S.Ct. 1138, 1143, 1 L.Ed.2d 1394 (1957). The 1992 regulations have done just that.

As the Supreme Court stated in *Manhattan Gen. Equip. Co. v. Commissioner,* 297 U.S. 129, 134, 56 S.Ct. 397, 400, 80 L.Ed. 528 (1936):

> The power of an administrative officer or board to administer a federal statute and to prescribe rules and regulations to that end is not the power to make law, for no such power can be delegated by Congress, but the power to adopt regulations to carry into effect the will of Congress as expressed by the statute. A regulation which does not do this, but operates to

create a rule out of harmony with the statute, is a mere nullity.

In promulgating the 1992 amendments, the Secretary exceeded his authority. We affirm the judgment of the district court.