**COALITION OF NEW YORK STATE CAREER SCHOOLS, INC.,**
Plaintiff–Appellee,

v.

**Richard W. RILEY, Secretary of Education, in his official capacity,**
**Defendant–Appellant.**

No. 964, Docket 96–6174.

United States Court of Appeals,
Second Circuit.

Argued March 12, 1997.

Decided Nov. 13, 1997.

Andrew L. Morrison, New York City, (Davidoff & Malito LLP, New York , On the Brief), for Appellee.

Jeffrica Jenkins Lee, Attorney, Appellate Staff, Civil Division, Department of Justice, Washington, DC, (Frank W. Hunger, Asst. Atty. Gen., Thomas J. Maroney, United States Attorney, Barbara C. Biddle, Attorney, Appellate Staff, Civil Division, Department of Justice, Steven Z. Finley, Office of the General Counsel, Department of Education, Washington, DC, Of Counsel), for Appellant.

Before: JACOBS and LEVAL, Circuit

Judges, and POLLACK, District Judge.[1]

LEVAL, Circuit Judge:

The Coalition of New York State Career Schools, Inc. (the "Coalition") sued to block the enforcement of 34 C.F.R. § 668.22 (the "Regulation"), a regulation made effective in 1995, which sets forth procedures for refunding student and government funds when a student withdraws from, fails to enroll in, or is expelled during a course of study at a federally-funded educational institution. The United States District Court for the Northern District of New York (Cholakis, *J.*) entered a permanent injunction barring enforcement of the Regulation on the theory that it represented an impermissible modification of the refund formula set forth in the governing statute, 20 U.S.C. § 1091b. 894 F.Supp. 567 (N.D.N.Y.1995).

We believe the district court's conclusion was based on an erroneous interpretation of the statute. Section 1091b sets forth the *minimum* amount that must be refunded to a student in order for an institution's policy to be considered fair and equitable. Nothing in the statute precludes the Secretary from determining that a larger amount must be refunded in certain instances. Nor does the statute dictate that the government, rather than the educational institution, should bear the risk of student non-payment. We believe the Regulation is a reasonable interpretation of the statute. We therefore vacate the injunction entered by the district court and dismiss the complaint.

## I.

Title IV of the Higher Education Act governs federally-funded student financial aid programs for college and post-secondary vocational training. 20 U.S.C. §§ 1070 *et seq.* In 1992, Congress amended the Act to improve the accountability and integrity of institutions participating in Title IV programs. *See* H.R.Rep. No. 102–447, at 10 (1992), *reprinted in* 1992 U.S.C.C.A.N. 334, 343. As part of the amendment, Congress instituted a requirement that participating educational institutions develop and implement a "fair and equitable" refund policy for early student withdrawal. *See* 20 U.S.C. § 1091b(a).

Section 1091b(a) states that each participating institution must establish "a fair and equitable refund policy under which the institution refunds unearned tuition, fees, room and board, and other charges to a student who received [federal financial aid]" if the student does not register for, fails to complete, or withdraws prior to completion of, the enrollment period for which the aid was intended. Subsection (b) of the statute provides that a refund policy "shall be considered to be fair and equitable" if the refund provided is "at *least the largest* of the amounts provided under" (1) state law; (2) the institution's nationally recognized accrediting agency formula, if approved by the Secretary; or (3) the formula for pro rata refunds set forth in § 1091b(c)(1). 20 U.S.C. § 1091(b) (emphasis added). Subsection (c)(1) defines "pro rata refund" as

> not less than that portion of the tuition, fees, room and board, and other charges assessed the student by the institution equal to the portion of the period of enrollment for which the student has been charged that remains on the last day of attendance by the student ... less any unpaid charges owed by the student for the period of enrollment for which the student has been charged.

20 U.S.C. § 1091b(c)(1). Under 20 U.S.C. § 1092(a)(1)(F), any refunds due are credited first to federal assistance programs, then to other assistance programs, and then to the student.

Title IV financial aid is paid at the beginning of a student's enrollment period, or at regulated intervals over the course of an enrollment period. *See, e.g.,* 34 C.F.R. § 690.3(b) (Pell grants); 34 C.F.R. § 682.207(c)(3) (FFEL loans); *see also* 34 C.F.R. § 668.4 (defining payment periods for all federal aid programs). When a student withdraws before the end of the enrollment period, participating educational institutions

1. The Honorable Milton Pollack, Senior Judge of the United States District Court for the Southern District of New York, sitting by designation.

must return financial aid received from the government in order to account for the school's reduced educational obligations toward the student.

Education Department regulations in effect prior to 1991 did not require schools to consider a student's accrued but unpaid share of tuition, fees, room and board, and other charges when calculating the proper amount to be refunded by the institution to the relevant government Title IV program. Instead, federal aid could be applied to cover any scheduled payment not yet remitted by the student. The school thus could withhold from its refund to the government the student's unpaid share of tuition and fees.

Under the old regulations, therefore, the government bore the risk of student non-payment. "[A] student who ha[d] not paid all of his or her institutional charges prior to dropping out receive[d] more title IV, HEA program assistance than a student who ... paid his or her institutional charges in full." Student Assistance General Provisions, 56 Fed.Reg. 66496, 66498 (1991). The effect of the regulations was to "treat students who diligently pa[id] their bills on time unfairly and reward students who [we]re negligent in making their payments...." *Id.* at 66499.

In 1991, the Secretary proposed to amend the regulations' treatment of refunds to take into account a student's expected payment to the institution. *See id.* The proposed amendments provided that "an institution must exclude [from the amount of government aid it is permitted to retain] any unpaid amount that the student was obligated to pay for the payment period." *Id.* The practical effect of the proposed regulations would be to require the participating institution to obtain the student's share of tuition and fees from the student, and not from government aid.

In 1992, Congress adopted the current language of 20 U.S.C. § 1091b quoted above. In 1993, the Secretary implemented the proposed 1991 amendments, noting awareness that the governing statute had changed. *See* Student Assistance General Provisions, 58 Fed.Reg. 32188, 32189 (1993).

In 1994, the Secretary proposed further amendments in order "to clarify the terms used in the statutory definition [in 20 U.S.C. § 1091b] of a fair and equitable refund policy." Student Assistance General Provisions, 59 Fed.Reg. 22348, 22348 (1994). The amended regulations, like the 1993 version, place the risk of student non-payment on the educational institution and require that a student's own resources be used to pay educational costs before Title IV assistance will be expended. The amended regulations became effective as of July 1, 1995. *See* 59 Fed.Reg. at 61142.

Under the resulting, current version of the Regulation, 34 C.F.R. § 668.22(b)(4), an institution calculating a refund other than the pro rata refund (*e.g.,* calculation under state law or an accrediting agency's formula) "must subtract the unpaid amount of a scheduled cash payment from the amount the institution may retain...." A scheduled cash payment is the amount due from a student, defined as the amount of institutional charges less any amounts payable by federal or state student aid programs. 34 C.F.R. § 668.22(g)(2)(ii). This provision, therefore, requires that the federal program be reimbursed for the amount it contributed to cover the unearned portion of the student's education, without deduction of fees owed by the student that were not paid. The educational institution, rather than the government, thus bears the risk of the student's ultimate non-payment.

The Coalition represents the interests of approximately forty New York trade schools, most of which participate in various Title IV student aid programs. On November 18, 1994, the Coalition filed a complaint seeking declaratory and injunctive relief. The Coalition claimed that the Regulation illegally conflicted with 20 U.S.C. § 1091b.[2] The Coalition asserted that its members would suffer irreparable harm if the Regulation was enforced because they would be unable to recover the funds owed by destitute students. Its members faced criminal penalties if they refused to comply with the Regulation.

---

2. The Coalition also charged that the Regulation violated the Equal Protection Clause. The district court rejected the claim, and the Coalition has withdrawn its cross-appeal.

On January 6, 1995, the district court granted the Coalition's motion for a preliminary injunction barring enforcement of the Regulation. The district court agreed that the Regulation was an impermissible modification of the statute and that the Coalition was likely to win on the merits because "[t]he clear language of § 1091b(b) and (c) indicates that Congress did not leave [the proper treatment of unpaid student charges] to the discretion of the Secretary." 894 F.Supp. at 572. The district court interpreted the explicit exclusion of unpaid student charges in the pro rata refund definition under §§ 1091b(b)(3) and 1091b(c) as a reflection of Congressional intent that the Secretary not provide for a similar exclusion under §§ 1091b(b)(1) and (2). "Had Congress intended such a result, it would have placed such a calculation in the statute, as it has already done in the pro rata calculation under 20 U.S.C. § 1091b(c)." *Id.* The district court thus concluded that the Regulation was contrary to law.

The court entered summary judgment on April 12, 1996, permanently enjoining enforcement of the Regulation based on the reasoning of its earlier order.

## II.

■ We review *de novo* the district court's grant of summary judgment. *See Fund for Animals v. Babbitt,* 89 F.3d 128, 132 (2d Cir.1996). The underlying merits of the Coalition's claim are reviewed under the analytic framework established in *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984). Determining whether an agency regulation is a permissible construction of a statute is a two-step process. If the plain language of the statute speaks directly to the issue, the agency regulations must give effect to unambiguously-expressed Congressional intent. *See id.* If Congress has not directly addressed the issue, however, the court must determine whether the regulation is based on a reasonable interpretation of the statute. *See id.* at 843, 104 S.Ct. at 2782. Even if the reviewing court would have interpreted the statute differently, an agency's construction will be upheld so long as it is plausible and does not otherwise conflict with Congress' expressed intent. *See Perry v. Dowling,* 95 F.3d 231, 236 (2d Cir.1996).

■ The district court concluded that 20 U.S.C. § 1091b(b) and (c) were unambiguous expressions of Congressional intent regarding the proper calculation of refunds paid by participating institutions to the government. 894 F.Supp. at 571–72. The district court understood the express deduction of unpaid student charges from the pro rata refund calculation provided under §§ 1091b(b)(3) and (c) to manifest Congressional intent that no such modifications be made to calculations pursuant to state law or an approved accrediting agency policy under §§ 1091b(b)(1) or (2). Thus, the district court reasoned, Congress did not delegate to the Secretary authority to promulgate regulations forbidding participating institutions from retaining government aid to cover unpaid student obligations. *Id.*

The Ninth Circuit followed a similar analysis in its recent decision in *California Cosmetology Coalition v. Riley,* 110 F.3d 1454 (9th Cir.1997). The court reasoned that § 1091b(b) sets forth specific criteria for calculating the proper refund, and explained that "[i]f Congress wished to add additional criteria, it could have done so explicitly." *Id.* at 1459. The court concluded, by negative inference, that Congress intended for the Secretary to have no authority to adjust or in any way regulate the refunds calculated under state law or an accrediting agency refund policy. Congressional intent on this issue was clear, the Ninth Circuit explained, because "Congress directed institutions to *subtract* the unpaid [student] charges in calculating the pro rata refund but did not require adjustments for unpaid charges in any of the other subsections of § 1091b(b)." *Id.* at 1460 (emphasis in original).

On the other hand, the D.C. Circuit, considering the same question, has concluded that the governing statutes are in tension and that the Secretary was within his powers in prescribing the Regulation. *Career College Ass'n v. Riley,* 74 F.3d 1265, 1271–72 (D.C.Cir.), *op. denying reh'g,* 82 F.3d 476 (1996).

We respectfully disagree with the district court and the Ninth Circuit. We do not find in either the statutory language or the legislative history of § 1091b a Congressional intent to regulate who, as between the government and the participating institution, should bear the risk of student nonpayment. In the absence of Congressional direction regarding the allocation of the risk of student nonpayment, we consider the Regulation to be a reasonable interpretation of the statute.

The Coalition argues that the specificity of the pro rata definition in § 1091b(c) manifests Congressional intent that a refund calculated by excluding unpaid student charges be considered fair. Under the terms of § 1091b(c), a participating institution calculating the pro rata refund is entitled to deduct unpaid student charges from the amount refunded to the student and government aid programs. The Coalition interprets this provision as setting a de facto maximum on the amount that must be returned to the government by excluding student contributions not yet paid.

This analysis is belied by the terms of § 1091b(b). Subsection (b) provides that a refund policy shall be fair and equitable if it refunds "at least the largest" of the amounts provided for under the three calculations. The statute, therefore, provides the *minimum* required refund to be made by the institution. The Coalition, however, reads this section as if it specified the *maximum* refund that could be required. Nothing in § 1091b implies that the Secretary may not require a larger refund. Only a smaller refund is prohibited.

In addition, the Coalition misidentifies the intended beneficiary of the statute's requirement of fairness. Section 1091b(a) directs that "[e]ach institution ... participating in a program ... shall have in effect a fair and equitable refund policy under which the institution refunds unearned tuition, fees, room and board, and 'other charges to a student who received a grant or loan assistance ... if the student ... does not register ... or ...

withdraws [early]." Subsection (b) goes on to specify the minimum refund that shall be considered "fair and equitable." It is clear that in imposing this refund policy requirement on the institution, the statute concerns itself with the institution's fairness *to a student* who has not completed the funded term. The Coalition misreads this statutory provision by construing its requirement of fairness as applying to the allocation of burdens between the institution and the federal government. Section 1091b simply does not address the issue of fair allocation of risk as between the government and the institution.[3]

The pro rata refund formula of subsection (c), which requires the institution to make a refund to the student pro rated to the portion of the term in which the student was enrolled, permits but does not require the institution to deduct the student's owed but unpaid charges from the student's refund. All this clause means is that a refund *to the student* will be fair and equitable notwithstanding that the institution deducts the student's unpaid charges from the funds returned.

The Coalition argues that Congressional silence regarding the proper treatment of unpaid student charges under state law or an approved accrediting agency refund policy indicates an intent to remove the question from the authority of the Secretary and leave it to the sole discretion of the state or accrediting agency. This interpretation fails for two reasons. First, it cannot be squared with Congress' explicit delegation of authority to the Secretary to approve or disapprove accrediting agency refund policies. *See* 20 U.S.C. § 1091b(b)(2). Second, the Secretary has a general delegation of authority to promulgate regulations to implement the statute. 20 U.S.C. § 1098a(b). The 1992 statutory amendments were debated, conferenced, and enacted after the Secretary proposed regulations requiring institutions to bear the risk of student nonpayment in cases of early withdrawal. *See* Student Assistance General Provisions, 56 Fed.Reg. 66496, 66498 (1991)

---

3. Nor does the requirement of § 1092(a)(1)(F) that refunds made pursuant to the participating institution's policy be credited first to the government and then to the student indicate otherwise. This provision merely protects the government's priority. It does not require that the amounts refundable to the government be identical to the amounts refundable to the student. Nor does it convert § 1091b's requirement of fairness to the student into a concern for fairness in allocation of burden as between the government and the institution.

(proposing regulations). Nonetheless, neither the terms of the statutory amendments nor their legislative history assert a Congressional intent at odds with the proposed regulations.

The version of the bill proposed by the Senate Labor and Human Resources Committee and passed by the Senate included language similar to the current definition of "pro rata refund" in § 1091b(c), but did not provide for deduction of unpaid student charges for the period of enrollment. S. 1150, 102d Cong. § 495(e)(2) (1991). The companion bill proposed by the House Education and Labor Committee and passed by the House contained an otherwise similar provision that incorporated the deduction. H.R. 3553, 102d Cong. § 484B(d)(1) (1992). Neither committee described in its accompanying report the purpose of the inclusion or exclusion of that provision. *See* S.Rep. No. 102–204, 102d Cong., 1st Sess., at 45 (1991); H.R.Rep. No. 102–447, at 160, *reprinted in* 1992 U.S.C.C.A.N. 334, 493. The final compromise version of the bill includes the deduction of unpaid student charges in the definition of the pro rata refund, but the accompanying conference report does not even mention the provision. *See* H.R. Conf. Rep. No. 102–630, 102d Cong., at 529 (1992), *reprinted in* 1992 U.S.C.C.A.N. 334, 644. Despite lengthy debates in both the House and the Senate over the amendments, no explanation was ever given for the inclusion or exclusion of the provision governing unpaid student charges.

Because we are unable to discern a contrary Congressional intent regarding allocation of the risk of unpaid student charges as between the government and the institution, we must conclude that the Secretary's regulations are based on a reasonable construction of the statute. *Chevron,* 467 U.S. at 843–44, 104 S.Ct. at 2782.

### Conclusion

The permanent injunction imposed by the district court is dissolved and the plaintiff's complaint is dismissed.